257 P.2d 596

MARTIN et al. v. INDUSTRIAL COMMISSION et al.

No. 5696.

Supreme Court of Arizona.

May 18, 1953.

Rehearing Denied June 9, 1953.

Mangum & Flick, Flagstaff, for petitioners.

Robert E. Yount, Phoenix, for respondent Industrial Commission. Perry M. Ling and Robert W. Pickrell, Phoenix, of counsel.

UDALL, Justice.

Callie Hoovler Martin, a widow, and Andrew Roy Martin, her infant child, as petitioners, have brought before us for review an award of the Industrial Commission of Arizona—hereinafter termed the commission—denying dependents' claim for "death benefits" arising out of the death of the husband, Andrew Martin. The latter at the time was an employee of Swift & Company, who carried workmen's compensation coverage with the State Industrial Fund.

After the original award denying compensation was entered, a rehearing was granted where the facts were more fully developed, whereupon the commission reaffirmed its previous award.

There is no dispute as to petitioners' dependency, decedent's employment or the fact that he met his death as a result of carbon monoxide poisoning. The crucial question is whether death resulted from an accident arising out of and in the course of his employment.

The petitioners justly complain that finding No. 2, reading:

"That the *evidence indicates* that said deceased applicant, Andrew Martin, did not sustain a personal injury by accident arising out of and in the course of his employment" (emphasis supplied),

is not a positive finding of fact as is required by law. In the case of Martin v. Industrial Commission, 73 Ariz. 401, 242

P.2d 286, we termed such a finding a "qualified finding", and were it not apparent from the entire record that it was here intended as a positive finding we would set aside the award and send it back to the commission to make proper findings. To do so in the instant case would, we believe, not avail petitioners anything but only cause added expense and delay. We do, however, condemn such a finding and suggest that its use by the commission be promptly discontinued.

The facts, stated as they must be in a light most favorable to sustaining the award, are as follows: The decedent was employed by Swift & Company, Ice Cream Division, as a route manager. Working in and out of Flagstaff he covered the territory east to Winslow, west to Ash Fork, and south to Oak Creek Canyon, soliciting orders, collecting accounts, and making deliveries. He was largely left to his own discretion in performing his work so that he sometimes started as early as 6 a.m. and remained on the job until 6 p.m.

The employer's facilities in Flagstaff consisted of a 2½ ton refrigerated truck which would keep ice cream safely from 12 to 14 hours without its electrical refrigeration units being operated, a warehouse in which there were offices, garage space for trucks, and large walk-in cold storage boxes where the company's products were stored.

The warehouse is located in Flagstaff on Aspen Street, east of but in the same block as the Monte Vista Hotel. The building occupies 50 feet of south frontage on the street with a 10 foot door and driveway in the center. On either side of this door are offices running back into the building approximately 25 feet on one side and 30 feet on the other. Beyond the offices the building is used for trucks or taken up with storage rooms and walk-in coolers.

Here briefly, in chronological order, are the pertinent events preceding and after the accidental death of Andy Martin. The decedent left his home on Friday evening, January 4, 1952, because of a domestic quarrel. He did not return home again but stayed away that night and the following two nights as he had on other occasions when the circumstances were similar. At such times it had been his practice to sleep in the truck at the garage. On Sunday, January 6, he spent the evening hours at several of the night clubs in Flagstaff, being last seen at a cafe at 2 a.m. on Monday morning. At 5:50 a.m. that morning John Hickey, an employee of the Arizona Distributing Company which, as a sub-lessee of Swift & Company, used the same warehouse, arrived to pick up his truck. He observed the decedent, as he had on other occasions, in a reclining position on the seat of the truck. The witness stated, "He didn't move. He acted like he was sound asleep." Ernest Buckman, also employed by the Arizona Distributing Company, as its branch manager,

with an office in the same building, arrived shortly before 9 a. m. and was in his office all morning except for a brief period when he went out for coffee. Mr. Buckman was found at noon by Alan Kinvig, slumped unconscious on the office floor from carbon monoxide gas poisoning, but he was revived at the hospital. Mr. Kinvig later discovered the decedent lying dead in the truck seat when he was sent to turn the truck motor off, by Dr. Sechrist who was called to treat Mr. Buckman. Attempts at resuscitation of the decedent failed. Evidence of important facts and details from many witnesses fill out the chronological framework above. In order to highlight and make patent the various inferences that the commission might draw we shall treat the evidence topically rather than by a summary of the testimony of each witness.

## Shoes

The witness Hickey testified that the first thing he noticed upon arriving at 5:50 a. m. was the decedent's shoes. They were on the cement floor by the lefthand cab door which was pulled closed but not latched shut. When Mr. Kinvig discovered the body he sought aid and Lee Hutchison and Dr. Sechrist assisted in removing the dead body of decedent from the truck. The doctor and Hutchinson testified that his shoes were then off. Mr. Kinvig did not remember whether they were off or not when they removed the body but did see them shortly thereafter

in approximately the same place testified to by Hickey.

## Position of the Body

Witness Hickey described the position of decedent when he saw him at 5:50 a. m. as "laying down with his head to the right side." When discovered at noon his position was described by the witness Hutchison as reclining, his head being toward the righthand door of the truck, his legs entangled in pedals and gear shift lever. Mr. Kinvig testified he was slumped over on the seat, his legs under the steering column. Dr. Sechrist stated that the legs were in the levers; that he was twisted in the truck; and that around decedent's mouth there was dried saliva and blood which had apparently been there for some time. Mr. Paxton, a deputy sheriff, made an inspection of the premises after the body had been removed and described among his findings dried sputum in successive layers running down the edge of the seat though all of it was not yet completely dry.

## Rigor Mortis

Many lay witnesses, including the mortician who observed and handled the body, testified about the presence or absence of rigor mortis, and most, if not all, of them stated the body was completely limp. However, Dr. Sechrist's testimony is clear and direct on the subject and the commission was free to disregard the testimony of less-qualified or experienced per-

sons. The doctor testified that when discovered rigor mortis had already set in, and as a result thereof they had considerable difficulty in extracting the legs from the gear levers and in removing the body from the cab. He further testified that the face and neck were discolored, and had wrinkles where he had been lying which did not come out. The cab was described as being "stifling hot" and the doctor stated this would retard rigor mortis.

In view of the rigor mortis, discoloration and wrinkles, it was the doctor's written opinion on the day of the inquest that "he had been dead from two hours up to six or eight hours". At the formal hearings held thereafter, at no time did he fix the time of death at "less than two hours" prior to the discovery of the body.

### Truck Refrigeration Unit

Mr. Hickey testified that the electrical cord which supplied power to the truck's refrigeration unit was plugged into the power source when he was in the building shortly before 6 a. m. The temperatures in the large "walk-in box" as well as the truck refrigeration unit were controlled by thermostat and only operated as needed. He stated positively that neither of these units were then running, nor was the truck motor. Mr. Buckman, on opening up for business, walked past the truck to get a snow shovel. At that time the truck unit was connected and running, as well as the motor on the reefer box, and he stated they were very noisy so that the quiet Chevrolet truck motor would not have been heard though it were running. Mr. McCauley, the justice of the peace and ex officio coroner, whose office was adjacent to the premises, borrowed the snow shovel about 9:30 a. m. or 9:40. When shown pictures of the premises with the truck purportedly parked as it had been on January 7, 1952, with the cord plugged in, he confirmed their accuracy. Mr. Paxton, the deputy sheriff, stated that the unit was still connected when he inspected the premises at approximately 2 p. m.

### Opportunity for Observation

Two persons testified that they saw decedent on the streets of Flagstaff on the morning of January 7, 1952. The first in point of time was Mr. Herring, who was standing by the window inside the Rose Tree Buffet between 8:20 and 9:00 a. m. when he stated he saw the decedent walk by. The second was a Mrs. Eleanor P. Durkee, who testified decedent passed her on the street between 9:30 and 10:00 a. m. when she was on her way to have some coffee. No other person testified that they saw the decedent or did any business with him that morning. As to others more closely associated with him and who would have had much greater opportunity to have seen him had he been on duty that morning, the evidence is as follows: John Conrard's place of business was next door to the Swift & Company warehouse. He went to work at 8 a. m. that morning and did not see decedent until the body was

discovered. Ernest J. Hogan, an employee of Conrard, did not see decedent on that day until discovered after noon. Mr. Kinvig worked at the offices of the Coconino Sun which are across the street from the warehouse. He did not see the decedent until he opened the truck door to shut off the motor. Judge McCauley, who borrowed the snow shovel, did not see decedent before he was discovered dead.

Mr. Buckman testified the large entrance door through which Martin would necessarily have entered was locked when he arrived. He did not see decedent that morning though he was in the building and in his office the entire morning except for the short time he went out for coffee. The office had a glass partition so that anyone moving in the driveway would have been seen by him.

Upon these facts and the inferences raised therefrom the commission made its finding that decedent "did not sustain a personal injury by accident arising out of and in the course of his employment."

■ This court has in prior opinions set forth the meaning of these terms, the most recent being the case of Serrano v. Industrial Commission, 75 Ariz. 326, 256 P.2d 709. Therefore, it is sufficient to say that the phrase "arising out of" refers to the origin or cause of the injury and the phrase "in the course of" refers to the time, place, and circumstances of the accident.

■ The cause of death was established by the coroner's jury as monoxide poisoning, and the commission so found. The monoxide gas was generated by the idling of the truck motor which warrants the inference that the decedent had put it in operation. The risk of monoxide poisoning was inherent in the employment, and if this accident occurred "in the course of" it would patently have "arisen out of" the employment. Stated another way, the narrow question is whether the accident arose "in the course of" the employment, for the risks of monoxide poisoning from the operation of a truck which an employee uses in discharging his duties is inherent in and a natural consequence of that employment. 71 C.J., Workmen's Compensation Acts, § 398; Goodyear Aircraft Corporation v. Gilbert, 65 Ariz. 379, 181 P.2d 624.

■ It is the privilege and duty of the commission, as the trier of fact—and not of this court—to resolve all conflicts and draw warranted inferences. What, then, is the inference in support of the award regarding the time, place, and circumstances of the accident that under the evidence the commission was free to base its findings and award upon? One possible inference is that as decedent had for his own purposes spent the latter part of the night in the truck it was a mere coincidence that (1) the place the accident occurred was the place of employment, (2) that the time of the accident might have been, but was not necessarily, within the

hours of employment, and (3) that the truck in which the accidental death occurred was used in the employment.

■ With the exception of two matters in evidence irreconcilable with the above inference which we shall discuss hereinafter, there was no evidence supporting an inference that decedent ever entered upon his duties or into his employment on the day of his death that is not also consistent with an inference that he did not so enter upon or into his employment. Where two inferences may be thus drawn the commission is at liberty to choose either, and its conclusion will not be disturbed unless it is wholly unreasonable. F. W. Woolworth Co. v. Industrial Accident Commission, 17 Cal.2d 634, 111 P.2d 313.

■ A wholly unreasonable inference is that decedent intended to drive off in the truck just prior to the time he was overcome by monoxide gas, since the front door of the building was closed, the electric cord from the truck refrigeration unit was connected with the wall outlet, and he was in his stocking feet. During January in Flagstaff a man who is about his duties in an unheated garage does not go about with his shoes off. Such would be contrary "to the usual propensity" of men. Furthermore, had decedent once been up and about town that morning is it not most improbable that he would have again removed his shoes with the snowy weather then prevalent? Was not the commission justified in inferring, under these circumstances, that the decedent came to the garage as a sanctuary in the early morning hours to sleep, that he removed his shoes and, becoming cold, at some unknown time thereafter started the motor to warm the cab and thereafter lapsed into unconsciousness—from inhaling this lethal gas—with death resulting? Petitioners, however, deny the right of the commission to draw any such inferences due to the apparent limpness of the body. "Medical authorities agree that it is not possible to fix the time of death from the onset of rigor mortis. * * .*" Commonwealth v. Woong Knee New, 354 Pa. 188, 47 A.2d 450, 455. In that excellent opinion are collated the medical authorities bearing upon this question. It appears therefrom that generally rigidity appears from two to six hours after death though there are many well-authenticated cases showing instantaneous onset after sudden death, caused by violent muscular exertion, thus furnishing decisive evidence of the manner and circumstances of death. See, also, 77 C.J.S., Rigor Mortis, p. 418, with footnote. Peterson, Haines, and Webster, in Legal Medicine and Toxicology, Vol. 1, 2d Ed., p. 187, say:

"The difference in time required for the appearance of rigor mortis in the various muscles probably depends upon some difference in their chemical condition. * * * Rigor may be very long delayed or may be so slight as to escape notice. * * *"

There are so many factors entering into the problem of fixing the time of death by the rigor of the body that no set rule can be laid down. A trained physician is entitled to give his "personal opinion" thereon but the testimony of a layman would obviously have but little probative value.

 It must be remembered that the burden of proving that the accident arose out of and in the course of decedent's employment rests upon the petitioners, and the commission is not required to disprove the claim. Martin v. Industrial Commission, supra. The petitioners seek to meet this responsibility by invoking the presumption of "unexplained death", which is,

> "When an employee is found dead under circumstances indicating that death took place within the time and space limits of the employment, in the absence of any evidence of what caused the death most courts will indulge a presumption or inference that the death arose out of the employment." Larson's Workmen's Compensation Law, Sec. 10.32, p. 101.

See, Martin v. Industrial Commission, supra. While the quotation is a correct statement of the law, this rebuttable presumption cannot be invoked in the instant case for the reason that there is (1) not an "absence of any evidence of what caused the death" (only petitioners suggest that it was not accidental), and (2) the commission was entitled to infer from all the circumstances that the decedent that morning had not entered into his employment.

The direct testimony of the witnesses Durkee and Herring, that they saw the decedent on the morning of the accident, cannot be reconciled with the inference upon which the finding and award rest. The petitioners assign as error the commission's election "to disregard the undisputed evidence of disinterested persons, which is contrary to law".

The rule governing the right of the trier of fact to disregard uncontradicted testimony has been invoked in many Arizona cases. In nearly all cases the rule is stated as a qualified prohibition or exceptions are given. See Banco de Sonora v. Morales, 23 Ariz. 248, 203 P. 328; Crozier v. Noriega, 27 Ariz. 409, 233 P. 1104; Otero v. Soto, 34 Ariz. 87, 267 P. 947; Phen v. All American Bus Lines, 56 Ariz. 567, 110 P. 2d 227; Ison v. Western Veg. Dist., 48 Ariz. 104, 59 P.2d 649; Equitable Life Assur. Soc. v. De Johnson, 36 Ariz. 428, 286 P. 817; In re Gary's Estate, 69 Ariz. 228, 211 P.2d 815; Lee v. Industrial Commission, 71 Ariz. 171, 224 P.2d 1085; Ratley v. Industrial Commission, 74 Ariz. 347, 248 P.2d 997.

 Justice Lockwood's statement of the rule in Otero v. Soto, supra, following the earlier case of Crozier v. Noriega, supra, both of which quoted from the California case of Davis v. Judson, 159 Cal. 121, 113 P. 147, has been followed—in abbreviated form—as the rule in this juris-

diction. The quoted part of the Davis opinion, with Justice Lockwood's full statement of the rule, is as follows:

" 'While it is the general rule that the uncontradicted testimony of a witness to a particular fact may not be disregarded, but should be accepted by the court as proof of the fact, this rule has its exceptions. The most positive testimony of a witness may be contradicted by inherent improbabilities as to its accuracy contained in the witness' own statement of the transaction, *or there may be circumstances in evidence in connection with the matter, which satisfy the court of its falsity.* The manner of the witness in testifying may impress the court with a doubt as to the accuracy of his statement and influence it to disregard his positive testimony as to a particular fact, and, as it is within the province of the trial court to determine what credit and weight shall be given to the testimony of any witness, *this court cannot control its finding or conclusion denying the testimony credence, unless it appears that there are no matters or circumstances which at all impair its accuracy.'*

"In other words, *if any circumstances appear in the case which would justify a reasonable man in discrediting the statement of a witness,* the jury may refuse to believe it, even though it is not directly challenged, but they may not arbitrarily reject uncontradicted evidence when nothing intrinsic in the evidence itself or extrinsic in the circumstances of the case casts suspicion thereon." Otero v. Soto, supra [34 Ariz. 87, 267 P. 949]. (Emphasis supplied.)

For a detailed discussion of the rationale of the rule, see, Wigmore on Evidence, 3d Ed., sec. 2495, and Jerke v. Delmont State Bank, 54 S.D. 446, 233 N.W. 585, 72 A.L.R. 7.

In the instant case, as we have pointed out, there are many extrinsic circumstances which cast suspicion upon the testimony of the witnesses who testified they saw decedent on the streets of Flagstaff the morning in question. In this situation there is no rule of law compelling the commission to accept it. The rule of law involved is that which announces that the trier of fact will determine the matter and be sustained by this court, when reasonable minds considering the evidence could properly come to different conclusions. The decision in the final analysis is based upon reason and logic. We hold, therefore, upon the entire record the commission did not act arbitrarily and thus did not err in disregarding said testimony, as upon the facts of this case reasonable men could differ.

The second matter of evidence, irreconcilable with the inference upon which the award is based, is that Mr. Hickey testified positively the truck motor was not running

at 5:50 in the morning. In every other instance the motor was either recognized to be running or the noisy motors on the refrigeration units were operating so that the truck would not have been heard.

■ What we have said about the testimony of the witnesses Durkee and Herring is also controlling on this question. After examining the record we cannot say that the evidence is so clear and complete and free from ambiguity that the trier of fact has acted in a whimsical or arbitrary manner but, rather, we find that the circumstances and evidence are such that reasonable men might well reach different conclusions.

We deem it unnecessary to treat the other assignments of error.

■ Our Workmen's Compensation Law does not provide for a general health and accident coverage, hence every accidental death of an employee is not compensable.

Award affirmed.

LA PRADE and WINDES, JJ., concur.

PHELPS, Justice.

I dissent.

I recognize the rule of this court that where evidence submitted to a fact-finding body is of such a character that reasonable men may draw different inferences therefrom, the finding of that body upon such evidence is binding upon this court and the fact that three of my associates have drawn different inferences from that upon which I seek to base my conclusion should constitute a compelling reason for my concurrence in affirming the findings and award of the commission. However, the facts in this case are such that I desire to enter a protest against the findings and award of the commission upon the evidence as shown by the record.

First, the testimony of the witness Hickey, truck driver for Buckman who was in the garage where plaintiff's truck was parked at around 6:00 a. m. walked right by the truck and saw Martin in the cab apparently asleep. He stated under oath he was positive the truck motor was not running at that time. He also said that neither of the refrigerator motors were running at that time. Therefore there was nothing to prevent him from hearing the motor of the truck running if it had been. Hickey was a disinterested witness. His testimony was unequivocal. To reach the conclusion arrived at by the commission, it had to disbelieve Hickey.

Buckman testified that he went into the garage round 9:00 a. m. and walked right by the truck. At that time he said both refrigerator motors were running and were noisy. When asked if he observed whether or not the truck engine was running, he replied: "No, I didn't, I didn't hear it running." In a statement previously made before an investigator for the commission,

Buckman testified somewhat at variance with the above. He was asked the question:

"Q. Did you notice any motors running at that time? A. The compressor on the the ice cream truck. I wouldn't say the compressor on the big box was running.

"Q. Did you notice the motor of a truck running? A. Not at all.

"Q. If it had been running, would the noise from the motor of the compressor probably drown it out? A. I believe it would, because that compressor is rather noisy.

"Q. Much noisier than an automobile motor would be? A. Yes."

His testimony relative to whether the truck motor was or was not running at 9:00 a. m. is negative and has no probative value whatever. The truck motor was running at around 12 o'clock noon. If it was not running at 6:00 a. m. and was running at noon, it was started by someone during that period and Martin was the only man who could have started it for the reason that there were no other persons in the garage during that period except Buckman who testified he went to the restaurant for a cup of coffee 15 or 20 minutes before 10:00 a. m. Mrs. Durkee saw him at the restaurant that morning having a cup of coffee. She had just met Martin on the street and had said "Hi" to him. She first thought she would stop Martin and tell

him he was expected to appear before the selective service board, by whom she was employed, the following day, but the weather was so bad she decided to call him over the phone and give him the information. She positively identified the date as the 7th. Buckman said he was out of his office about 15 minutes. He further stated he either bought a package of cigarettes at the restaurant or walked on to Prochnow's News Stand and bought one—he didn't remember which. He didn't remember seeing Mrs. Durkee at the restaurant that morning, although he said he had frequently seen her there. He didn't remember whether the restaurant was crowded or just how it was that morning. He didn't remember whether the wind was blowing hard or not.

One so unobserving could have failed to observe Martin enter the garage that morning before he went to the restaurant or he could easily have been mistaken about the length of time he was absent from his office for coffee. His testimony was most unsatisfactory about everything he attempted to relate. In any event Martin could have gone to the garage soon after speaking to Mrs. Durkee and entered it while Buckman was at the restaurant or at Prochnow's purchasing cigarettes.

Hickey testified that he observed Martin's shoes beside the door of the cab,

"* * * Just as if a man would start to climb up in the truck, if you had the door open and started to step

in, if you would take your shoes off, that's just exactly the position they were in."

The witness Kinvig said he didn't remember anything about Martin's shoes. In answer to the question, "They could have been on or off. Is that correct?" he answered, "That's correct." He stated he didn't notice Martin's shoes beside the door of the truck while assisting in removing his body from the cab but he did look back from the entrance to the garage as he was leaving (some 30 to 35 feet away from the truck), and saw the shoes. When asked where they were with respect to the door of the truck cab he said,

"Well, I couldn't tell from where I was standing. I was right at the entrance way. They appeared to be right there at the side of the cab."

Kinvig was then asked if he removed Martin's shoes from his feet and he testified that he didn't know whether he did or not. The testimony is that Martin's feet and legs were entangled in the gears. The witness testified that Dr. Sechrist and a Mr. Hutchison had hold of Martin's shoulders and that he, Kinvig, cleared his feet which were hung up on something. It is entirely probable that Kinvig removed Martin's shoes to aid in disentangling his feet from the gears. He said he was greatly excited at the time. The witness Hutchison who assisted in getting Martin out of the truck observed at some time that Martin's shoes were off but never saw the shoes at all. At the hearing before the commission on April 23, 1952, Dr. Sechrist did not mention whether Martin had his shoes on or off, or whether he saw the shoes at all. He had stated on a former occasion to an investigator for the commission that when he first saw Martin his shoes were off. He said when they got him out of the truck he didn't have any shoes on. This is probably the first time he observed the shoes were off.

Dr. Sechrist testified that rigor mortis had set in at the time they were attempting to remove him from the truck while all of the other witnesses including Kinvig and Hutchison, the undertaker and his assistant, testified that the body was very, very limp and one witness said in moving him to the undertaking establishment, he had to put his hands under his belt to keep them from falling off the side of the cot on which the body was laid. The doctor further testified that the body was warm and that the discoloration of his face about which he testified could have taken place in two hours after his death.

It will be observed that the doctor placed Martin's death from two to six hours prior to 12 o'clock noon. While the undertaker who had probably had more experience in observing how soon rigor mortis sets in after death than any witness who testified, placed the time of death of Martin at one to one and one-half hours prior to 12:15 p. m. when he received the body for transfer

to the undertaking parlors. He stated positively that rigor mortis had not then set in.

Deputy Sheriff Paxton testified that he made an examination of the interior of the truck cab after the body had been removed and found sputum of deceased on the seat of the truck. In answer to a question of the referee what that indicated to him other than that Martin's head had been in a certain position, he replied that "It indicated, due to the freshness of part of the sputum, that it had been done very recently." He further stated that portions of the sputum had dried on the edges and

> " * * * From the doctor's testimony, which we had to go on, the assumption was that due to the heat in the cab, the sputum tended to dry rather rapidly, and it appeared to be overlaying in successive layers. * * * "

I submit that Dr. Sechrist's testimony as to when Martin died based upon rigor mortis is not entitled to as much weight as that of the undertaker who fixed the death at one to one and a half hours prior to 12:15 p. m. while the doctor fixed, at from two to six hours, the margin within which death could have occurred. Such a statement, it appears to me, shows such a lack of definiteness as to the time of death as to render its probative value nil. Especially is the above true if we consider the number of witnesses who testified that the body was limp and the testimony of the doctor himself that the body was still warm when removed from the truck. And especially in view of the further testimony of the doctor that "And after working with him (Martin) 15 or 20 minutes, we realized it was hopeless." If Martin had been dead two to six hours at the time he was taken from the cab, the doctor should have realized then that resuscitation was impossible.

The witness Herring testified that he saw Martin pass the Rose Tree Buffet between 8:20 and 9:00 a. m. on the morning of the 7th, indicating that Martin probably was out of the garage at the time Buckman went to work at a few minutes before 9:00. The witness Martinez who was cleaning up in the buffet at the time, stated positively that Herring told him at the time Martin passed the buffet that he had just gone by and that later in the day at around 2:00 p. m. after hearing of Martin's death, Herring again mentioned that he had seen Martin go by the buffet that morning.

Thus we have the testimony of two witnesses who saw Martin on the streets of Flagstaff on the morning of the 7th between 8:20 and 10:00 a. m. and spoke to him, one of whom was corroborated by the witness Martinez. We have the testimony of Hickey that at 6:00 a. m. the motor in the truck positively was not running. We have the testimony of Kinvig that it was running around 12 o'clock noon. We have the fact that no one was at the garage between 6:00 a. m. and the time Martin was found dead near the noon hour except Martin, Hickey and Buckman. If this is true

the fact is inescapable that Martin turned the truck motor on during that period, which he probably did upon his return to the garage around 10:00 a. m. after meeting Mrs. Durkee on the street. It was snowing and he doubtless concluded not to make a trip outide of Flagstaff and because of domestic conditions at home and because of the fact that he had been up until after 2:00 a. m. that morning he decided to sleep a little while. The testimony showed that Martin usually worked from 6:00 a. m. to 6:00 p. m. If Martin was seen on the street by Herring and Mrs. Durkee his death arose during the course of his employment.

Against all this testimony we have one extrinsic circumstance. The witness Hickey testified that he saw Martin's shoes beside the left-hand door of the cab. No other witness said he saw the shoes at the same place where Hickey saw them. Naturally if Martin returned to the garage during the absence of Buckman and again removed his shoes they would necessarily be within a few feet of where Hickey saw them. Kinvig said that after he had reached the entrance of the garage, leaving the building, he looked back and noticed the shoes there but couldn't tell where they were with relation to the door of the truck. Kinvig, in his excitement could have removed Martin's shoes for the purpose of disentangling his feet and legs from the gears which would be a very natural and logical thing to do and in his excitement, not remember having done so. As above stated, he was unable to say that he did not do so.

With due deference to the members of the commission for whom I have the greatest respect, it appears to me that they totally disregarded the positive testimony of the witnesses who saw and spoke to Martin on the streets of Flagstaff on the morning of his death. They disregarded the testimony of Hickey who said he was positive the engine of the truck was not running at 6:00 a. m. and the testimony of Kinvig that he turned the motor off around 12 o'clock noon. They disregarded the testimony of a goodly number of witnesses who testified that the body of Martin was very limp when removed from the truck and taken to the undertaking establishment. They disregarded the statement of Dr. Sechrist that rigor mortis could set in within two hours after death and that the body was warm when removed from the cab of the truck. They disregarded the testimony of the deputy sheriff that the saliva on the seat of the truck from the mouth of deceased was fresh at 12 o'clock indicating it had not been there long. And they singled out the one extrinsic circumstance relating to Martin's shoes being seen by Hickey beside the left door of the truck cab at 6:00 a. m. To my mind to accept this circumstance as proof of Martin's death having occurred before he entered upon the discharge of the duties of his employment is very much like

the fellow who asserted he had seen an elephant climb a telephone pole and when his veracity was questioned, in order to prove his assertion he said, "Well, there is the pole."

I am sincerely of the view that the findings and award should be set aside.

STANFORD, Chief Justice (dissenting).

Having written the original opinion in this case but not having a majority of the members of the court to concur with me, I now, in the main, submit the same opinion as and for my dissent, except facts, already stated, and except for supplementing briefly at the close.

This action has to do with an unexplained death, and this court—in the case of Martin v. Industrial Commission, 73 Ariz. 401, 242 P.2d 286, 288, which had to do with a case in which the deceased was killed on May 6, 1950 in an automobile collision in Maricopa County, Arizona, where there was nothing to show what caused the death, there being no eyewitnesses—stated:

> "The petitioner contends that under these circumstances a presumption or at least an inference arises to the effect that Martin was within his employment at the time of the accident. For support she relies upon the annotation in 120 A.L.R. 683 and the rule stated therein as follows: 'It is generally held that when it is shown that an employee was found dead at a place where his duties required him to be, *or where he*

*might properly have been in the performance of his duties during the hours of his work,* in the absence of evidence that he was not engaged in his master's business, there is a presumption that the accident arose out of and in the course of the employment within the meaning of the compensation acts.' * * * "

In our case just referred to, the award of the Industrial Commission denied compensation but it was set aside by this court.

In Medina v. New Mexico Consol. Min. Co., 51 N.M. 493, 188 P.2d 343, 345, where previously compensation was denied the widow of Ignacio Medina, believing that the deceased had met his death by suicide the Supreme Court had this to say:

> " * * * Whether a violent death is accidental or suicidal, the law presumes that it is accidental until the contrary is shown by a preponderance of the evidence. * * *

> "We do not attempt to explain the death. To do so leads to speculation, conjecture and surmise. Here, as in most death cases, the dependent is deprived of her best witness, the employee himself. However, the essential facts necessary to a recovery need not be proved by direct evidence, but may be established by reasonable inferences drawn from proven facts."

In the instant case, however, the respondent does not have as a defense that suicide was the cause of death of Martin.

The testimony of Eleanor P. Durkee in the case before us, in part is as follows:

"Q. Did you have occasion to see Mr. Martin on the morning of January 7, 1952? A. Yes, sir, I did.

"Q. Where did you see him? A. It was approximately in the alley-way, right past my office, and why I remembered it is that Mr. Martin had some business in our office and he was going to have some business in our office the following day, and I was going to stop him and tell him to be up there at a certain time, but it was a miserable day and I just said, 'Hi,' and kept going and thought I would call next day. The time was between 9:30 and 10 o'clock. I usually go out for coffee at that time."

Charles Edwin Herring testified in the case as follows:

"Q. Did you have occasion to see Andrew Martin on the morning of January 7, 1952? A. I did.

"Q. Will you state to the Referee just what you saw? A. Well, I was standing in the west window looking south, watching a car trying to get away from the curb across on Santa Fe Street, and Andy came by the street with a tooth pick in his mouth and nodded to me as he went by."

In reference to the witnesses giving such testimony as above quoted, we quote now from Lee v. Industrial Commission, our own case, 71 Ariz. 171, 224 P.2d 1085, 1086:

"The Commission cannot disregard the undisputed evidence of a disinterested person. * * *"

Mr. John Conrard testified that he was the owner of his own machine-shop at Flagstaff, and his place of business was just east of the place where the truck in question was stored; that he went to the warehouse in question when the body was found and that he used the inhalator on Andy Martin after his body was removed from the truck. He was asked these questions, among others:

"Q. Were any refrigeration units working when you went in, do you know? A. Yes, the two stationary ones back there. I don't know whether they were both running, but one was; I heard that. And the one on the truck was operating."

The coroner's jury impanelled in this matter brought in a verdict to the effect "That Andrew J. Martin came to his death on the 7th day of January, 1952, in Flagstaff, Coconino County, Arizona, by carbon monoxide poisoning; and that his death was accidental."

In this court's case of Strauss v. Industrial Commission, 73 Ariz. 285, 240 P.2d 550, 554, we said:

"* * * Acts of the employee for his personal comfort and convenience

while at work such as taking a drink of water, lighting a cigarette, warming himself, do not interrupt the continuity of the employment. * * *"

In Andreski v. Industrial Commission, 261 Wis. 234, 52 N.W.2d 135 (a 1952 case), where a sheriff had gone to visit many taverns in his own county on his own personal business and had likewise gone into another county prior to his unexplained death, the court, in setting aside the award of the Industrial Commission, and the Circuit Court, which confirmed the commission's action, quoted from its case of Tewes v. Industrial Commission, 1928, 194 Wis. 489, 215 N.W. 898, 899, as follows:

"* * * when it is established that employees have entered upon the performance of their duties and are found at a place where they might properly be in the discharge of those duties, nothing appearing to the contrary, the presumption of continuity obtains, * * *."

The evidence in this case shows that when the first person arrived at the warehouse that morning, about ten minutes of six o'clock, he said "nothing was on" in the way of a motor and he passed right by the truck. Neither the motor of the truck nor the plug-in of the refrigerator that held the products that the truck hauled were on. Later on, however, as the testimony above-quoted will show, a witness came upon the scene and said that the electricity caused by plugging into the wall and running the refrigerator was running. This indicates that after the seeing of Martin by the first witness, John W. Hickey, and the time when others came on the scene hours afterwards, someone had plugged in the refrigerators and they were receiving the electricity to restore them. The inference is that no one would do it but Martin.

Flagstaff, Arizona, has an elevation of 6,896 feet; it was snowing on the morning of January 7th; the wind was blowing and people took shelter in places to get out of the weather. Who needed his products so early, or why should his truck take out over the mountain roads to cover the distance from Winslow, Arizona to the east to Ash Fork to the west, a distance of 109 miles?

If Martin slept in his truck at the place of business of Swift & Company when trouble was imminent at home, the petitioner should not be penalized for it. He was protecting his master's interests. He may have temporarily abandoned his home but he never abandoned his job.

Referring to the time when rigor mortis sets in, the majority opinion relies on the testimony of Dr. Sechrist, the physician who was present when the body was taken from the truck. He testified, "he had been dead from two to eight hours." William L. Compton, the mortician, said rigor mortis

had not set in when the body was removed from the truck. When a doctor is called at time of death he generally, unless life is in sight, takes but a moment, but the mortician lives with the dead. Who knows best? But the testimony definitely shows that Dr. Sechrist worked on the body for 15 minutes when it was taken from the truck, hoping to restore life, and at the same time oxygen was being given to Martin.

Without hesitation, I say the award of the industrial commission should be set aside.