309 P.2d 250

Clifford Bryan WHITE, Petitioner,

v.

The INDUSTRIAL COMMISSION of Arizona, and Bert A. Gibbs (Douglas-Maintenance Company), Defendant-Employer, Respondents.

No. 6324.

Supreme Court of Arizona.

March 26, 1957.

Ira Schneier, Tucson, for petitioner.

Robert K. Park, Phoenix, for respondent, Industrial Commission, John R. Franks, Donald J. Morgan, Phoenix, and James D. Lester, Tucson, of counsel.

PHELPS, Justice.

By certiorari from this court, petitioner White, a journeyman lineman (electrician) seeks a review of the finding and award of the Industrial Commission of July 12, 1956, affirming findings and award made on March 15, 1956, in which it awarded him temporary disability compensation to that date for injuries sustained by accident arising out of and in the course of his employment on October 7, 1954.

It is the contention of petitioner that the commission erred in its findings of fact Nos. 10, 11, 12(e) and 12(f), upon the ground that there is no substantial evidence in the record to support any of them.

The findings of which petitioner complains and the evidence upon which each is based are as follows:

"10. This commission finds that applicant is *physically unable to perform heavy duties* in his job classification as a journey-man lineman, *but is capable of performing duties of a lighter nature requiring the job classification of a journey-man lineman.*" (Emphasis supplied.)

Petitioner agrees with the first part of the finding to the effect that he is physically unable to do the heavy duties in his job classification as a journeyman lineman, but claims there are no "lighter jobs" in that classification. He testified that the work of a journeyman lineman is to set poles, climb poles, string wire, install transformers and anything pertaining to the outside electrical work. The witness Wm. A. West, business manager of Local Union 570 of the Electrical Workers, who has been a journeyman electrician for 38 years, testified that all of the work in the classification of a journeyman lineman is heavy work. West had previously testified that there isn't anything in the electrical business, inside or outside, available that Mr. White could do with his disability unless some big job came along like the one at San Manuel just finished. He said on those big jobs where many men are employed, you could cover up and keep a man on the job when he is working with a crew and looks like he is busy.

We construe his testimony to mean just what he says, i. e., that *there are no light jobs* in the classification of a journeyman lineman or a journeyman wireman and it is only on big jobs like the San Manuel job that light work is available, and that is done by cover-up methods where a disabled person is given work in a large crew where he appears to be busy, when, in fact, he is not required to perform the duties required of a lineman or a wireman. He testified that big jobs like the San Manuel job rarely occur in this area. He stated he asked the foreman at San Manuel to find something for petitioner to do.

White was first given the job of operating a "Winch Truck" at San Manuel which was given to him by foreman Allen at the

request of West. Allen testified a "Winch Truck" was used only on big jobs in moving equipment spools or reels of wire and other heavy equipment, as well as pulling wire or cable through ducts (or conduits). This operation required the use of feet in shifting clutch pedal, and arms in operation of levers and brings into operation all of the muscles of the body in twisting the body to watch signalman behind him, etc. Allen stated he had to let petitioner go because he couldn't do the work, but stated he later gave him work in the warehouse keeping material separated for distribution to different jobs, but, in order to do this he had to give him a classification other than a journeyman lineman.

■ Allen also testified that there were no light duty jobs; that if they have a light duty job they have to create it for somebody and he said that was what they did in White's case. They took an able-bodied man in the warehouse, who was a journeyman wireman, and replaced him with White, but in doing so had to give White a wireman classification. This evidence was no where disputed and there is nothing intrinsic in the evidence or extrinsic in the circumstances which casts suspicion upon its veracity. Therefore the commission could not ignore it as they apparently did. Martin v. Industrial Commission, 75 Ariz. 403, 257 P.2d 596. We therefore hold that there was no evidence whatever to support the latter portion (italicized) of finding No.

10 for the reason that there is no light work in that classification. The commission found petitioner to be physically unable to perform heavy duties as a journeyman lineman.

Finding No. 11 and the evidence bearing thereupon is as follows:

"11. This commission finds that applicant is capable of performing duties of a lineman estimator, *and other duties of a similar nature not requiring strenuous physical duties for which said applicant would reasonably expect to earn wages equivalent to, and in excess of, the average monthly wage as set forth in Finding No. 5.*" (Emphasis supplied.)

Petitioner testified that he had done a little work as an estimator and that he could do that kind of work. The witness West testified that in his opinion White could not do such work because it required a college degree in engineering to do it, thus placing the evidence in conflict on that point. But there is no evidence in the record to support the further finding that petitioner is also capable of performing

*"other duties of a similar nature not requiring strenuous physical duties for which said applicant would reasonably expect to earn wages equivalent to, and in excess of, the average monthly wage as set forth in Finding No. 5."*

There is no evidence whatever in the record that there are "other duties of a similar

nature" to the work of an estimator, either of a strenuous or light character, in the classification of a journeyman lineman or of any wages petitioner might earn in performing such duties. In fact, the testimony of witnesses that all of the work in the classification of journeyman lineman is heavy tends to refute the fact that such duties exist.

And finally, we consider Finding No. 12 to the effect that petitioner's physical functional disability has resulted in no loss to his earning capacity, and especially (e) and (f) of such finding, which reads as follows:

"(e) That applicant has a general physical functional disability not greater than 10% resulting from said accident, the same being general in nature, *and not affecting said* applicant's earning capacity.

"(f) That applicant's wages earned since his injury are truly indicative of applicant's ability to earn, and are reasonably indicative of applicant's future ability to earn." (Emphasis supplied.)

With respect to petitioner's post-injury earnings as bearing upon his post-injury earning capacity, Larson on Workmen's Compensation Law, Vol. 2, section 57.21 states the rule to be that:

"It is uniformly held, therefore, without regard to statutory variations in the phrasing of the test, that a find-ing of disability may stand even when there is evidence of actual post-injury earnings equalling or exceeding those received before the accident. The position may be best summarized by saying that actual post-injury earnings will create a presumption of earning capacity commensurate with them, *but the presumption may be rebutted by evidence independently showing incapacity or explaining away the post-injury earnings as an unreliable basis for estimating capacity.* \* \* \*" (Emphasis supplied.)

A careful study of the evidence bearing upon subsection (e) of finding No. 12 to the effect that petitioner's functional disability of 10% does not affect his earning capacity, compels us to conclude that there is no substantial evidence to support such a finding, for the reason that the presumption that the post-injury earnings constituted the measure of petitioner's earning capacity was successfully rebutted by undisputed evidence and thereby renders his post-injury earnings unreliable as a basis for determining permanently his post-injury earning capacity.

Doctors Schwartzman and Weber examined petitioner on June 21, 1955, and reported that he then complained of pain in the dorso-lumbar part of his back where x-rays showed a fracture of the twelfth dorsal and which had been treated as a fresh compressive fracture; that petitioner com-

plained of fatigue and pain in the low back at the end of the day but that he had worked twenty-one days in March, and was then working at what was considered light work. (He was, in fact, operating a winch truck and was replaced by the foreman because he was unable to do the work.)

The report further shows that if petitioner has to do much in the way of lifting or stooping over he has more complaints; that he complained also of pain in the back of his neck and some headaches, which occur once or twice a week and were present when the examination was made; the most acute point of tenderness was found to be between the twelfth dorsal and first lumbar vertebra with no true involuntary spasm noted; that his condition was stationary; x-rays showed a little increased wedging between initial film and those taken in March following, which further substantiated diagnosis of a compression fracture of that area (12th dorsal).

Dr. Weber did not testify at the trial but Dr. Schwartzman did and furnishes the only evidence which tended, even in any degree, to support the finding in No. 12(e). When asked by the referee, if, on the basis of his examination of petitioner and x-rays, he could install poles, climb poles, string wire, install transformers and anything pertaining to outside electrical work, he responded:

"At the present time I can't state, but at the time we saw him in June '55, there was no measurable orthopedic finding that would contra-indicate his attempting to do that work, and I believe performing it on the basis of objective findings, that is stuff we could actually see and measure."

The question could have been answered by a simple "yes" or "no". Just what the Dr. intended to convey by this answer is not clear to the layman. But closely following this answer he was asked by the referee:

"Q. From your examination, would Mr. White have difficulty in bending or twisting or lifting? A. He might have; not strictly from the examination itself, but from the type of injury he had and from the x-rays we saw of this man, there is recorded here the finding that there was a little wedging of one of the vertebral bodies involved. D-12 * * * With that little wedging in itself is of no particular significance but it might well indicate that an individual who has had an injury to the back which would result in a fracture such as the wedging indicates was present, he might have pain if he tries to do heavy lifting and bending, yes.

"Q. And twisting motions? A. Yes."

■ The latter answer however makes it clear that whatever heavy work petitioner attempted to do, such as heavy lifting, bending and twisting, would result in pain and discomfort to him, and we believe, conforms with the commission's finding "that petitioner was physically unable to perform heavy duties in his job classification as a journeyman lineman."

The witness West a man of long experience in that business, as above stated, and Allen of twenty-seven years experience, both testified that petitioner could not do the heavy work and that there was no light work in the business. We do not believe the answers of Dr. Schwartzman constitute conflict in the evidence on this point and therefore, there is in the record, no substantial evidence supporting this finding. The Doctor's testimony was limited to physical disability and had no bearing on his earning capacity.

■ Finding No. 12(f) to the effect that the wages earned subsequent to his injury are truly indicative of his ability to earn since his injury, and of his ability to earn in the future, is unsupported by any substantial evidence. The work petitioner did in the operation of a "winch truck" at San Manuel and at Davis-Monthan Field, according to both West and Allen, is only available on big jobs, and they were rare in this area, and petitioner was replaced on both jobs before they were completed. The foreman at San Manuel testified that he had to let him go because he was afraid he would hurt someone. Petitioner said he was let out by Howard P. Foley Company on the Davis-Monthan Field job but was not told why. Both jobs were procured for White on the basis that he was disabled. West testified he was surprised petitioner could operate the "winch truck" on the Davis-Monthan Field job as long as he did. He further testified that electrical contractors would not employ a man in White's condition and that there is nothing in the electrical field that he can work into at his age. He stated that any work, other than that of an outside journeyman lineman, would require an apprenticeship before petitioner could work at it as a journeyman. This would be true even in the high voltage wire installation jobs. Before he could do the work of a journeyman wireman he would be required to serve an apprenticeship.

The work done by petitioner for Corbin-Dykes Electric Company in April and May, 1956, was a special job given him by a Mr. Terry Starks, foreman, who was requested by West to make a place for him. His work there was to ride a truck from which wire was being unrolled from a reel loaded thereon. The duties assigned to him were to see that the wire unrolled properly during the day; that they unrolled one mile a day and during the time the truck was standing idle he cut wire in forty-four inch lengths, tieing them into bundles for use

in tieing the line wire in on the insulator. During all of this time he was not required to be on his feet at all or to employ any part of his body except his hands and arms. For the purpose of enabling him to qualify for this job he was classified as a groundman but did not perform the duties of a groundman, which, as hereinabove outlined, are very heavy.

The above constitutes all of the evidence on this point other than the amount of post-injury wages paid to petitioner which, under the circumstances of this case, appears to us to have only a slight bearing on his real post-injury earning capacity. This is true for the reason that petitioner either worked on jobs specially created for him or on jobs from which he was let out because of his physical inability to do the work.

There being no substantial evidence in the record to support the findings of the commission, the award is set aside.

UDALL, C. J., and WINDES and STRUCKMEYER, JJ., concur.

LA PRADE, Justice (dissenting).

I cannot agree with the majority disposition of this case, nor do I agree with the reasoning involved in attaining such a result.

This case presents one issue *only:* was the finding of the Commission, to the effect that the injury of petitioner had not affected his earning capacity, sustained or justified by the evidence?

The Commission found that the applicant has a general physical functional disability not greater than 10% resulting from the accident, general in its nature, and not affecting applicant's earning capacity, and

"That applicant's wages earned since his injury are truly indicative of applicant's ability to earn, and are reasonably indicative of applicant's future ability to earn."

The applicant has *not* challenged the finding that his general physical functional disability does not exceed 10%.

By provisions of section 23–1044, A.R.S. 1956, relating to compensation for partial disability, it is provided in subsection C, relating to so-called non-scheduled injuries, that

"* * * where the injury causes permanent partial disability for work, the employee shall receive during such disability compensation equal to fifty-five per cent of the difference between his average monthly wages before the accident and the amount which represents his reduced monthly earning capacity resulting from the disability, * * *."

It is provided in subsection D that

"In determining the amount which represents the reduced monthly earning

capacity for the purposes of subsection C of this section, consideration shall be given, among other things, to any previous disability, the occupational history of the injured employee, the nature and extent of the physical disability, the type of work the injured employee is able to perform subsequent to the injury, any wages received for work performed subsequent to the injury and the age of the employee at the time of injury."

The findings of the Commission demonstrate that the Commission did take into consideration (a) the occupational history of the employee, (b) the nature and extent of the physical disability, (c) the type of work the employee is able to perform subsequent to the injury, (d) any wages received for work performed subsequent to the injury, and (e) the age of the employee at the time of the injury.

What was the record before the Commission? At the time the petitioner was injured, in October 1954, he was employed by the Douglas Maintenance Company, as an electrician-lineman, with average monthly earnings of $213.52 (not disputed). Within a month after being released to "work status" petitioner went to work for the Utah Construction Company. He was there employed two days less than one month and drew $504 in wages, at a rate double his average monthly wage prior to the accident. The next month and one-half he was out of work. He then secured employment with a different employer, H. A. Foley, electrical contractor, where he drew $1,005 for the two months' employment, which was at a rate of more than double his average monthly earnings prior to the accident. Without losing any time he was again employed for two months by the Utah Construction Company, where he drew $972.81, which is again double his average monthly earnings prior to the accident. He was off work for less than one month and in October secured employment and worked until some time in December—earnings for this period were not disclosed. He was then out of work, reason not disclosed, until March 26, 1956, when he worked two months for Corbin-Dykes, electrical contractors, for which he received as a groundman $332.51 and as a lineman $637.50, making a total of $970, which again is at a rate double his average monthly earnings prior to the accident.

It must be remembered that the Industrial Commission is the fact-finding board. With this record before it I think it was entirely justified in finding that there had been no loss of earning capacity, which is the only question that was before it. The majority constitute themselves the fact-finding body, and find that the testimony of the witness, Allen, foreman for the Utah Construction Company, is binding on the Commission because it convinces the majority. With reference

to Mr. Allen's testimony to the effect that they "made" the job for petitioner, the court says:

"This evidence was no where disputed and there is nothing intrinsic in the evidence or extrinsic in the circumstances which casts suspicion upon his veracity."

I think there is something intrinsic in this evidence which casts suspicion upon it. I do not believe that the Commission was bound to believe this witness when he testified, in effect, that he cheated his own employer and caused to be paid to the petitioner out of his employer's funds the sum of $1,476.81 for three months' work at a time when, in his opinion, the petitioner had impaired capacity to produce. A like observation can be made to the testimony of Mr. West, the union business manager, who testified, in effect, that he connived with Mr. Allen to "cover up" for petitioner, with the undisclosed purpose of bleeding the employer. The majority labelled the testimony of Mr. West and Mr. Allen as uncontradicted, and, that the fact-finders should have believed these witnesses.

Petitioner has not challenged the finding that his average monthly wage, prior to the accident, was $213.52. During the eleven months that he worked after the accident he earned $3,400. For non-scheduled injuries the injured employee does not receive any compensation for his injuries, regardless of how painful or serious, unless they result in a reduced monthly earning capacity measurable in dollars and cents. If the injured employee earns more after the injury than prior to the injury this fact presents to the fact-finders some tangible evidence that they can appraise, and goes directly to the only inquiry before them—reduced monthly earning capacity. In quest of the correct answer the statute specifically directs "among other things" to consider "any wages received *for work performed* subsequent to the injury * * *." (Emphasis supplied.) Of course the majority find that the Commission should have found that he did not perform any work for which he should have received substantial wages, though he did receive $3,400.

The petitioner is not without remedy if at some time in the future he suffers a loss of earning capacity due to a subsequent change in his physical condition resulting from the original injury. Section 23–1044, subd. F, supra. Until the happening of such an event he has no standing before the Commission or this court.

The case has now been remanded back to the Commission, presumably for the purpose of compelling it to enter the award that should have been entered, and find that the petitioner has a reduced earning capacity, measurable in dollars and cents, which will equal 55% of the difference be-

tween his average monthly wages ($213.52) before the accident and the amount which represents his "reduced monthly earning capacity" resulting from the disability, section 23–1044, subd. C, supra, which, at the time of the award, was twice as great as his average monthly wages before the accident. Query?

The award should be affirmed.