789 P.2d 401

**Carroll O. BENNETT (Dec'd), Wanda D. Bennett (Widow), Petitioner,**

v.

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Southwest Charter Lines, Respondent Employer,**

**State Compensation Fund, Respondent Carrier.**

**No. 1 CA–IC 88–143.**

Court of Appeals of Arizona, Division 1, Department D.

March 27, 1990.

Wisniewski & Fendon by Jonathan H. Grinder, Phoenix, for petitioner.

Christopher E. Kamper, Chief Counsel, State Compensation Fund by Diane Lindstrom, Phoenix, for respondent employer and respondent carrier.

Anita R. Valainis, Chief Counsel, Indus. Com'n of Arizona, Phoenix, for respondent.

FIDEL, Judge.

A workman sustained a fatal gunshot wound at his place of employment during working hours. Though the wound apparently resulted from the accidental discharge of his own gun, other circumstances are much in doubt, as is the question whether he was occupied in personal or work-related business at the time.

This case concerns the widow's death benefit claim. The employer's insurer denied the claim, and the Industrial Commission found it noncompensable after hearing. We consider two questions on review. First, was the widow entitled to the unexplained death presumption? Second, did the evidence permit reasonable inference or merely speculation as to whether the workman had left the course of his employment when his gun discharged? These questions are integrally related; the answer to the second determines the answer to the first.

## FACTS

Respondent employer, Southwest Charter Lines (SWCL), is a charter bus company. The employment duties of decedent Carroll O. Bennett included cleaning buses, maintaining their fuel and oil, and cleaning the bus yard. The decedent's supervisor, his brother Lester, supervised SWCL's bus and maintenance personnel.

SWCL's bus yard is located in an industrial section of south-central Phoenix. The scheduling of charters occasionally required decedent to work at night. The Bennett brothers sometimes carried handguns while at work. SWCL's owners knew of this practice and did not object.

David Pike was SWCL's sales manager and the owner of a new pickup truck. During Thanksgiving week of 1987, Pike took a vacation and left the truck parked in the bus yard. Although he had occasionally allowed other employees to use the truck, he instructed his secretary not to permit anyone to use it during his absence on this trip. He left her the keys, however, in case the truck had to be moved.

The secretary testified that she kept Pike's keys in her purse until Friday afternoon, then left them on her desk for Pike to take on his return. Lester Bennett testified, however, that he took the keys from the secretary's desk before Thanksgiving, used the truck to run an errand, and left the keys in his own desk. He also testified that he told his brother Carroll to watch the truck and that he could use it if an emergency arose.

On November 30, Carroll Bennett was alone at work. At approximately 1:30 a.m., police and paramedics received a 911 emergency call from the bus yard. The police arrived within minutes and found Bennett slumped on the office trailer steps with a mortal gunshot wound under his chin. A

trail of blood and disrupted gravel led from the office to Pike's truck, where, beside the passenger door, Pike's keys and decedent's gun were found. In the maintenance yard, some fifty to seventy-five feet away, stood a partially cleaned bus, lights on and motor running. Near the bus a tool shed door stood open. The bus yard gates were closed but unlocked.

The police found no sign that anyone had tampered with the truck's exterior; however, its passenger door was unlocked, and its seat was rotated forward, revealing a box on the exposed passenger side floor. Gunpowder residue was detected among the contents of the box, and blood was also found within the truck.

The police concluded that Carroll Bennett had been alone and had accidently shot himself while bending over the box. An investigator determined, based on the location of powder residues and blood, that "Mr. Bennett was bent over at the waist when the weapon discharged in an upward direction and [the bullet struck] him just below the chin." The police did not inventory the box, and the officers who testified could not recall what it contained. David Pike testified that he had placed personal items in the box and that these did not include tools. Lester Bennett testified, however, that he once had seen a screwdriver in the box and that there "might have been a pair of pliers or screwdriver in [the truck] and some tools or something."

The administrative law judge accepted as fact the policemen's partial reconstruction of events and their conclusion that death was accidental. This reconstruction, however, did not explain why Carroll Bennett had digressed from cleaning the bus to the vicinity of the truck. The administrative law judge acknowledged the absence of direct evidence on this question; the only known witness was dead. He concluded, however, that the preponderance of circumstantial evidence supported the inference that the decedent's purpose was personal. His conclusion that the death was noncompensable was affirmed on administrative review, and this special action followed.

## THE UNEXPLAINED DEATH RULE

The unexplained death presumption relaxes a claimant's ordinary burden to prove that death or injury arose out of and in the course of employment. The presumption arises when a worker's unexplained death occurs within the time and space limits of employment. As Larson describes the rule,

> When an employee is found dead under circumstances indicating that death took place within the time and space limits of the employment, in the absence of any evidence of what caused the death, most courts will indulge a presumption or inference that the death arose out of the employment.

1 A. Larson, *Workmen's Compensation Law* § 10.32, at 3–100 (hereinafter Larson), *quoted with approval in Martin v. Indus. Comm'n*, 75 Ariz. 403, 411, 257 P.2d 596, 601 (1953). *See also Downes v. Indus. Comm'n*, 113 Ariz. 90, 93, 546 P.2d 826, 829 (1976) ("There is a ... presumption that when a workmen [sic] is killed on the job he was, at the time of the fatal accident, within the scope and course of his employment.")

The presumption is rooted in the principle that the workers' compensation statute shall be liberally construed in favor of payment of compensation benefits. *Young v. Envtl. Air Prod.*, 136 Ariz. 158, 163, 665 P.2d 40, 45 (1983). Larson explains:

> The occurrence of the death within the course [*i.e.*, the time and space limits] of employment at least indicates that the employment brought deceased within range of the harm, and the cause of harm, being unknown, is neutral and not personal. The practical justification lies in the realization that, when the death itself has removed the only possible witness who could prove causal connection, fairness to the dependents suggests some softening of the rule requiring claimant to provide affirmative proof of each requisite element of compensability.

Larson § 10.32, at 3–101 to –110.

Like other presumptions, however, the unexplained death presumption applies only in the absence of evidence sufficient to

permit reasonable contrary inference. *See, e.g., Martin,* 75 Ariz. at 411, 257 P.2d at 601; *Helton v. Indus. Comm'n,* 85 Ariz. 276, 279, 336 P.2d 852, 853 (1959). Where the evidence permits reasonable inference, as in *Martin* and *Helton,* that the employee was beyond the course of his employment, the administrative law judge may draw that inference and reject the claim.

This appeal accordingly requires examination of the sufficiency of the evidence. The critical question is whether the evidence permitted reasonable inference or only speculation that decedent was engaged in personal—not work-related—business when his fatal accident occurred.

## THE UNEXPLAINED DEATH RULE APPLIED

We conclude that the evidence is insufficient to permit non-speculative inference in this case. We begin with the fact that the decedent sustained his injury "within the time and space limits of [his] employment." Larson § 10.32, at 3–100. He was shot during working hours at his employer's yard. Second, there is no dispute that the gunshot arose from a risk related to his employment. Referring to the employer's acquiescent weapons policy, the administrative law judge concluded that the employer "should be deemed to have accepted the risks attendant to the carrying of handguns, namely, injury or death . . . from an accidental shooting. . . ."

Inquiry therefore narrows to whether the decedent left the course of his employment when he left a partially cleaned bus, lights on and motor running, for Pike's truck fifty feet or more away. The administrative law judge concluded that the decedent's reasons, whatever they were, were personal, not occupational. One can certainly imagine explanations along this line. The decedent might, for instance, have been snooping—looking into the truck to indulge his curiosity, or looking for something in particular that had no relationship to his work.

Equally readily, however, one can imagine work-related purposes leading decedent to the truck. The tool shed door was open;

Bennett might have been searching for a needed tool. Or perhaps he heard a sound in the night, feared prowlers, and inspected the truck to see if anything had been disturbed. These explanations, and many others, are accessible by imagination. All explanations, however—both work-related and personal—lack probative evidence to support their speculative leaps.

Respondents argue that this case should be decided, as *Martin* and *Helton* were decided, in deference to the administrative law judge's conclusion that the employee had left the course of his employment at the time of the activity that caused his death. Those cases, however, differ significantly in the availability of explanatory facts.

In *Martin,* the employee, a Flagstaff salesman with unfixed hours of employment, was found dead in his truck one winter morning at his employer's unheated warehouse. The truck motor was running, and the employee had been asphyxiated by carbon monoxide. The employee had occasionally slept in his truck at the warehouse after past domestic quarrels, and this history permitted the inference that his presence this particular morning was for personal, not occupational reasons. 75 Ariz. at 406–07, 413, 257 P.2d at 598, 602.

In *Helton,* the decedent was killed while driving his employer's truck about twenty miles from his Phoenix home. At the time, decedent was four days into a ten-day stint on a jobsite in Cornville, roughly 110 miles from Phoenix. The accident happened at 1:00 a.m.; decedent was due back on the job at 8:00 that morning. No one on the job could provide a work-related reason for the decedent's trip to Phoenix. A co-employee testified, however, that, shortly before he left the job site, the decedent said "he felt like going home." 85 Ariz. at 277–78, 336 P.2d at 852–53.

In *Martin* and *Helton,* the administrative law judges had substantial evidence to support their inferences that the employees were outside the course of their employment when they met their death. In this case, by contrast, the administrative law

judge had only speculation to bridge the inferential gap.

We recognize that "where two inferences may be drawn, the commission is at liberty to choose either, and its conclusion will not be disturbed unless it is wholly unreasonable." *Muchmore v. Indus Comm'n,* 81 Ariz. 345, 351–52, 306 P.2d 272, 276 (1957). Our supreme court has also stated, however, that "whether a particular inference can be drawn from the evidence is a question of law." *Helton,* 85 Ariz. at 280, 336 P.2d at 854. Moreover, Arizona courts have often recognized that a factfinder may not draw speculative inferences based on non-probative facts. *See, e.g., Casey v. Beaudry Motor Co.,* 83 Ariz. 6, 12, 315 P.2d 662, 666 (1957); *Golleher v. Horton,* 148 Ariz. 537, 542, 715 P.2d 1225, 1230 (App.1985). This principle is operative here.

## CONCLUSION

We conclude that it is inexplicable from the evidence of record what decedent was doing at Pike's truck when his gun discharged. Larson aptly describes the law that governs this case when he states, "a totally inexplicable action, undertaken while the employee is otherwise in the course of employment, does not break the continuity of employment, *when the action makes no more sense as a personally-motivated act than as a work-motivated act.*" Larson § 10.32, at 3–135 (emphasis added).

Larson also explains the unexplained death rule as an instrument of compensation in ambiguous circumstances such as these:

> If the employee, in the course of employment, engages in an utterly perplexing act for which no personal or employment motive can be deciphered, the neutral-risk principle should control and the employment connection supplied by the presence of the act within the course of employment should tip the scale in favor of compensability.

*Id.* at 3–129.

For the foregoing reasons, we set the Industrial Commission finding of non-compensability aside.

GRANT, C.J., and KLEINSCHMIDT, P.J., concur.