462 P.2d 792

**In the Matter of the ESTATE of Marian SILVA, Deceased.**

**George J. SILVA, Stella Foster and Manuel J. Silva, Appellants,**

**v.**

**Frances MIRAMON, Appellee.**

**No. 9664.**

Supreme Court of Arizona.

In Division.

Dec. 22, 1969.

Rehearing Denied Jan. 13, 1970.

244

Stockton & Hing, Phoenix, for appellants.

Gust, Rosenfeld & Divelbess, Phoenix, for appellee.

UDALL, Chief Justice.

This is an appeal from an order directing a verdict for the proponents of the will of Marian Silva, in a contest brought by her sister and two brothers, on the grounds of undue influence and lack of testamentary capacity.

Many of the facts are denied, but their truth is not in issue on a motion for a directed verdict made by the will's proponent. Such motion admits the truth of all of the contestants' evidence and of all reasonable inferences therefrom. The evidence must be treated in a light most favorable to the contestants and the motion may be granted only where the court would feel compelled to set aside a verdict for the contestants. Giving consideration to these principles, the facts are as follows:

That part of the Silva family which concerns us starts with Alex and John Silva, who were brothers. Alex and his wife, Mary J, had no children but made a home for several girls not their own. John and his wife, Guadalupe, had two sons, George and Manuel, and two daughters, Stella Silva Foster, and Marian Silva, the testatrix whose will is the subject of this case. Marian was born in 1910 and died in 1963 at the age of 53.

Mary J's first cousin, Concepcion Miramon, had a daughter, Frances Miramon born in 1905. Frances' mother died, and in 1916 her father remarried and sent Frances to live with Alex and Mary J Silva.

In 1923, Marian Silva was living with her parents in California. Her general physical condition was deteriorating and it was decided to send her to live with Alex and Mary Silva in the hope that the Arizona climate would improve her health. Her parents literally gave her away. Her change of residence was regarded as permanent, her parents ceased to contribute anything to her support, and it was well understood that upon their deaths she would not share in their estates.

Her health soon improved and she and Frances lived together in the Alex Silva household for over forty years, surviving Alex, who died in 1925 and Mary J, who died in 1948. Marian, of course, was Mary J's niece and Frances was Mary J's second cousin, so that the two girls were unrelated to each other. Nevertheless, both always referred to her as "Aunty." Most people thought of the girls as sisters and they were closer than most sisters.

Marian made her will in 1951, twelve years before her death. She left her entire estate to Frances.

We have carefully studied the reporter's transcript of the evidence. It consists of over 900 pages, so that only the highlights can be set forth here. Frances appears to have been strong and healthy all of her life. Marian, on the other hand, had a number of serious illnesses. She had St. Vitus' Dance, pneumonia, a nervous breakdown, cancer of the breast, colitis, heart trouble, and finally a stroke from which she died. Despite the number and seriousness of these illnesses, when spread over a forty-year period her health history does not appear to be spectacular.

As maid of honor at her sister's wedding, Marian wore black and refused to walk down the aisle with the groom. On nearly all occasions she looked away from persons who were talking to her. Often she would rise in the middle of a conversation, go to, and look out the window, and then return and ask "What were you saying?" She brushed her teeth so hard that her gums became infected, bled, receded, and required treatment by a gum specialist. She was restless, nervous, and moody. After the baptism of her sister's child in Florida she told the priest that the child had not been baptized. She was always brushing non-existent hair from her forehead.

Frances always "hovered" over Marian, bossed her, and never permitted her to be alone. She told Marian what to eat. She told her how to dress and what to wear. She told her when to retire, and tucked her in to bed at night. She always accompanied Marian to the bathroom and locked the door while inside. She prevented her brothers and sister from ever having a private conversation with Marian. She never allowed Marian to go away from the house alone.

The telephone in their home remained in the name of Mary J Silva after her death until the time of the trial nineteen years later. The girls acted as if Mary J, after her death, was still with them; they kept her bedroom spotless and changed the sheets regularly though the bed was never used. Neither of them trusted anyone else, and they had three locks on the front and back doors. They usually held hands when they sat on the couch and company was visiting. When they visited Marian's sister in Florida they insisted that their dishes be scalded and washed separately from the others. Frances told Marian that her brother and her father were thieves and crooks, and her mother was a spendthrift. The contents of the will were determined after only one day's discussion, and the lawyer who drew it up did not question her when told what she wanted in it.

Despite Frances' categorical denials of most of these statements and incidents, we must accept them as true for the purpose of the motion for a directed verdict. Contestants interpret these facts as painting a picture of a sickly, meek, suspicious old woman whose mind was unstable and who trusted and relied upon her lifetime friend and, in turn, was completely dominated by the friend and unable to resist her sinister influence.

But while we must accept the truth of the stated evidence, we need not ignore the evidence to the contrary when determining whether the inferences made by contestants are reasonable. A few examples will suffice. The wearing of the black dress at the wedding, is presented as a fact which indicates that Marian's mind was impaired. That is not a necessary conclusion. There is evidence that Marian did not approve of the marriage, and that she was not the

type of woman who would spend the money for a new dress for a special occasion. There is no showing that the dress she wore was not the most appropriate one in her wardrobe. There is even an admission in the transcript that the dress might not have been black but could have been navy. Contestants argue, from Marian's insistence upon boiling her dishes and glasses and keeping them separate from those of the other members of the family, that the jury could infer senility or undue influence. This sort of argument twists the facts and takes them out of context. In the instant case it was proved—and admitted by the proponent—that Marian had a serious infectious blood disease which would have been sufficient to justify taking such precautions with the dishes.

Space does not permit a fact-by-fact explanation of all the evidence. Suffice it to say that the picture painted is wholly consistent with the concept of an over-protective Frances, constantly hovering over her younger friend, waiting on her and attempting to protect her from drafts, over-exertion, overeating, etc. No doubt both women were unsophisticated, suspicious, conservative, and perhaps even eccentric. We cannot permit a jury to make the inferences that contestants want it to make. Every act of kindness is not necessarily motivated by greed or sinister motive. There is no single piece of hard evidence that Frances was using her position in the household, for her personal gain. Nor would it be illegal for her to cater to her wealthy friend in the hope that she would be remembered in her will.

It is true that undue influence is an insidious type of compulsion that is not generally exerted before eye witnesses, and therefore must usually be proved by circumstantial evidence. However, *more must be proved than mere opportunity and motive*. When a decedent leaves a large estate to a stranger, ignoring close ties of blood, there are situations in which it may be inferred that the will was the result of undue influence. Here, such is not the case. Marian was much closer all of her

life to Frances than to her own sister and brothers, and may have resented the arrangement by which her parents sent her to live with another family.

The contestants themselves gave much testimony which favored the proponent of the will. Manuel stated that he did not believe that Frances "made" Marian execute the will; that the only influence exerted upon Marian was "persuasion"; that Marian was perfectly capable of making her own will; and that the only reason he contested it was because Alex Silva failed to include Manuel's father in his will after promising to do so! George testified it was agreed that his father would leave all of his estate to Stella, George, and Manuel, and when his father died, that was done. He also stated that he had no knowledge of Frances having forced Marian to make her will, that he did not believe that Marian had any obligation to leave anything to him, and that *his own will contained no legacy for her*! Stella testified that she thought there was no obligation on the part of Marian to leave her anything and that she was contesting the will merely because she thought that Mary J should have left Stella's father something! She also stated that when Marian was undergoing surgery in 1952 (after the will had been drawn) the latter appeared to be mentally alert, and knew all of the relatives who visited her. She also said that Marian was a rather independent person and that *the relationship between Marian and Frances was very close and one that she and her brothers always respected*!

Although Marian was five years younger than Frances, she had a high school and business school education, while Frances never went past elementary school. Marian always drove the car when she and Frances were in it and, because of her superior education, she cared for the numerous business details of leasing farms, collecting rents, keeping books, etc. Her will was made in the office of Harold Divelbess, a prominent Phoenix attorney to whom Marian had gone on many occasions in connection with her business affairs:

He testified that he always regarded her as being competent to handle her affairs. Marian did all of the talking in Mr. Divelbess' office, telling him that she and Frances each wanted to make a will leaving all of her property to the other. In addition to Mr. Divelbess' testimony that Marian, at that time, appeared to him to be of sound mind and not acting under any undue influence, there was similar testimony on the part of his associate, James F. Henderson, and his secretary, Clara Bustrin.

Dr. Palmer saw Marian some 60 times between 1956 and 1963. He stated that she always did her own talking and that Frances never spoke for her. He described her as competent, capable, friendly, cooperative and intelligent.

Frances testified that when Mary J made her will leaving her property to Marian and Frances, Mary J had expressed a desire that they leave the property to each other and that the survivor leave it to those who were good to her—i.e. the sisters and brothers. She and Marian had their wills prepared with Mary J's desire in mind.

 In all cases where a properly executed will is offered for probate, there is a presumption that the decedent had testamentary capacity at the time it was made. This presumption continues even after he has been adjudicated incompetent to handle his affairs, because it is recognized that even such a person may have lucid intervals during which he knows the extent of his estate and the proper objects of his bounty. Estate of Thomas, 105 Ariz. 186, 461 P.2d 484, 12–1–69.

Contestants, however, do not rely solely on the evidence *admitted* by the court. At the trial they attempted to prove that the relationship between the two women was unnatural and immoral. The trial judge refused to admit any testimony along those lines, and all such evidence in the transcript is in the form of an offer of proof made in chambers in the absence of the jury. It would serve no useful purpose to repeat it here. If it were all competent, it would come very close to presenting a jury case, and the directed verdict might then have been erroneous. However, objections were made to almost every question, on various grounds. One objection was that the incidents observed were too remote from the date of the will. That objection, alone, is not sufficient as to most of the questions. Other objections were made on the grounds of hearsay, calling for a conclusion of the witness, no proper foundation, etc. Some of the objections are good; others are not. Without going into detail, we hold that after sifting out the answers to questions against which valid objections were made, there is insufficient evidence from which reasonable men could agree upon a verdict for the contestants. This holding applies not only to the answers of the psychiatrist, but also to those given by the witnesses and used as the bases of the hypothetical questions asked of the doctor. The transcript of the in-chambers hearing is replete with questions calling for hearsay, and for conclusions of a witness with a ninth grade education who could not possibly be considered to be an expert in any field let alone the field of psychiatry.

Even if all of the evidence had been admitted, we are inclined to agree with the proponent's argument that such evidence could not have accomplished anything more than to persuade the jury to find that there was a meretricious relationship between Frances and Marian. Inferences made in a vacuum are not reasonable. To proceed from a finding of a meretricious relationship, to a finding of susceptibility to influence, requires an inference. From a finding that Marian was susceptible to Frances' influence, to a finding that Frances exerted or attempted to exert undue influence, requires another inference. From a finding that Frances unduly influenced Marian, to a finding that such influence was so great as to overcome Marian's wishes, and force her to make a will contrary to her own desires, requires another inference. Thus, in order to arrive at a

verdict of undue influence sufficient to deny probate of the will, one must resort to an inference upon an inference, upon an inference. Such ratiocination is not permissible.

■ We therefore hold that the directed verdict in this case was not an abuse of the trial judge's discretion.

■■ There remains but one issue. A year and one half before the trial, contestants sought leave to amend their pleading by adding a count which would allege that they had compromised and settled their claim to share in the estate, and would ask for judgment for breach of the settlement agreement. The trial court denied the request on the sole ground that its jurisdiction in a will contest case was limited to determining the validity of the will. While it is true that in a will contest, the court must not extend the issues to the interpretation of the will, or to any other issue that must await the decision of the will's validity, this does not apply to an amendment setting out that the case about to be tried has been settled. R.C.P. 15, 16 A.R.S., provides that leave to amend shall be freely given. There can be no reason to deny such an amendment, in the absence of surprise or a delay in the trial caused by untimeliness of the request. R.C.P. 18 provides that claims of nearly every kind may be joined, where they do not involve different parties. There is no reason why contestants' amendment should not have been permitted. In fact we held, in Little v. Brown, 40 Ariz. 206, 11 P.2d 610, that it is the duty of the trial court to recognize the settlement and to refuse to proceed with the trial, even after our mandate to proceed with the trial has been received.

The trial court, therefore, was in error when it refused to allow the amendment, and was in error again in refusing to allow evidence of whether the case was settled and compromised. The second error was, of course the direct result of the first.

These errors, however, are not cause for reversal. We have examined the evidence by which contestants sought to prove the settlement. It appears in that part of the deposition of Frances Miramon which was excluded. In that deposition she was asked repeatedly whether she had indicated a willingness to settle by taking only a life estate in the property willed to her, and she repeatedly and unequivocally answered in the negative. She admitted that contestants' lawyer had drawn up a settlement agreement but stated that she never had any intention of settling on the basis contained in it, and denied authorizing her lawyer to settle on that basis. It is very clear that if the amendment had been allowed and the evidence had been admitted, the proof would have fallen far short of what would have been required to permit a verdict for the contestants to stand.

Judgment affirmed.

McFARLAND and HAYS, J., concur.