715 P.2d 1225

Margaret Ruth GOLLEHER, individually and as Personal Representative of the Estate of Arthur Raymond Hunter, Jr., deceased, Plaintiff-Appellant,

v.

Mary B. Martin HORTON and Herschel Horton, wife and husband; Joseph William Hunter and Victoria Hunter, husband and wife; Margaret Louise Hunter Haus, a single woman; Jennie Barbara Hunter Sandoz, a single woman; Phylis Mildred Hunter Garner, a single woman; A.R. Hunter, Sr., and Molly Hunter, husband and wife; Hunter Holding Corporation, an Arizona corporation; John Does 1–10; Jane Does 1–10; Black Corporations 1–10 and White Corporations 1–10; Correne Kelly, Defendants-Appellees.

No. 1 CA–CIV 7006.

Court of Appeals of Arizona, Division 1, Department C.

Sept. 12, 1985.

Reconsideration Denied Nov. 18, 1985.

Review Denied March 13, 1986.

Hocker & Axford, P.C. by R. Kelly Hocker, Tempe, for plaintiff-appellant.

Lewis and Roca by John P. Frank, Charles Crehore and George L. Paul, Phoenix, for defendants-appellees.

EUBANK, Judge.

Margaret Ruth Golleher (Ruth), daughter of the deceased Arthur Ray Hunter, Jr. and the personal representative of his estate, brought suit in 1974 against various members of her father's family. She alleged that they had wrongfully deprived him of certain property. The suit was dismissed in 1976 for discovery violations but the dismissal was reversed by this court in *Golleher v. Horton*, 119 Ariz. 604, 583 P.2d 260 (App.1978). Following remand, a jury trial was held and at the close of the plaintiff's case the court directed a verdict in favor of the defendants on two issues. Following the conclusion of the evidence, the court directed a verdict in favor of defendants on all of the remaining issues. Ruth filed a timely notice of appeal from the judgment entered on January 4, 1983.

The facts pertinent to this appeal are as follows. Arthur Ray Hunter, Jr. (Ray) had numerous medical problems many of which were related to excessive drinking. Following his hospitalization for an acute alco-

holic episode in 1964, Ray executed a general power of attorney to his sister, Mary Martin Horton (Mary). On November 30, 1964 Ray suffered a stroke which left him partially paralyzed and almost completely aphasic. Mary used the power of attorney to carry out several transactions prior to Ray's death in 1973. Two of those transactions are challenged in this lawsuit.

Ruth challenged Mary's use of the power of attorney in 1966 to terminate Trust 1722, a real estate holding trust of which Ray was a named beneficiary. She also contested Mary's transfer of 160 acres of unimproved desert land located near Buckeye from Ray to the Hunter Holding Corporation, an entity comprised of Ray's brothers and sisters. Ruth contended that her father was incompetent before and after he signed the power of attorney, making both transactions void. She also alleged that her aunts and uncles defrauded her father and exercised undue influence over him. On that basis she sought to have a constructive trust imposed upon the properties in question.

On appeal Ruth contends that the trial court erred because factual issues precluded directed verdicts on the issues of (1) her father's competency, and (2) alleged fraud or undue influence involving the termination of Trust 1722 and the transfer of the Buckeye property. She also contends that it was reversible error for the court to refuse to disqualify appellees' trial attorney.

Prior to addressing these arguments, we note that in reviewing an appeal from a directed verdict this court must consider the evidence in a light most favorable to the party opposing that motion, including all reasonable inferences to be drawn from such evidence. *Rocky Mountain Fire and Cas. Co. v. Biddulph Oldsmobile,* 131 Ariz. 289, 292, 640 P.2d 851, 854 (1982); *Gibson v. Boyle,* 139 Ariz. 512, 518, 679 P.2d 535, 541 (App.1983).

## COMPETENCY

We first consider whether the jury was presented with any evidence from which reasonable minds could conclude that Ray was incompetent at times pertinent to the disputed transactions. At trial the parties defined those pertinent times as September 29, 1964, when Ray executed the power of attorney and after Ray suffered a stroke on November 30, 1964.

In urging their motion for a directed verdict defendant-appellees argued that the standard for determining Ray's competence was the standard used for testamentary capacity, i.e. did he understand the nature of his act, the nature or character of his property and the natural objects of his bounty. *See Vermeersch's Estate,* 109 Ariz. 125, 128, 506 P.2d 256, 259 (1973); *Weil's Estate,* 21 Ariz.App. 278, 281, 518 P.2d 995, 998 (1974). However, on appeal they argue that the test is "whether a person is capable of understanding in a reasonable manner, the nature and effect of the act in which the person is engaged", *citing Estate of Head,* 94 N.M. 656, 615 P.2d 271 (1980); *Estate of Taggart,* 95 N.M. 117, 619 P.2d 562 (1980); *Roybal v. Morris,* 100 N.M. 305, 669 P.2d 1100 (N.M. App.1983).

Ruth argues that the appropriate test to determine whether her father was competent to execute the power of attorney was whether he was able to properly manage and take care of himself. She argues that this test is akin to the test for the capacity to contract (the "unsound mind" standard for purposes of A.R.S. § 12–502 (incapacity for purposes of tolling the statute of limitations for commencing a lawsuit)), and capacity for purposes of establishing a guardianship pursuant to A.R.S. § 14–5101. She has not directed us to authorities dealing specifically with competency required in executing a power of attorney.

We find no Arizona cases defining the competence required of a party executing a power of attorney. However, the execution of a power of attorney creates a principal-agency relationship. *See, e.g., Delos v. Farmers Ins. Group, Inc.,* 93 Cal.App.3rd 642, 656, 155 Cal.Rptr. 843, 851 (1979); *Kline v. Orebaugh,* 214 Kan. 207, 210, 519 P.2d 691, 695 (1974); *Mehus's Estate,* 278 N.W.2d 625, 629 (N.D.1979). We therefore

find general principal-agency law to be applicable.

The *Restatement (Second) of Agency* § 20 (1958) provides:

A person who has capacity to affect his legal relations by giving consent to a delegable act or transaction has capacity to authorize an agent to do such act or to conduct such transaction for him with the same effect as if he were to act in person.

Comment (c) to § 20 provides:

[P]ersons lacking full capacity because of mental defects are affected by acts done on their account by a person whom they direct so to act, to the extent to which they have capacity to give consent and become parties to the transaction.

The above provisions indicate that if a principal has the capacity to do the act which he has delegated to another (through a power of attorney or otherwise), the delegation is valid. This principle has been applied by some courts in evaluating the validity of a power of attorney. *See Beaucar v. Bristol Fed. Sav. & Loan Ass'n,* 6 Conn.Cir. 148, 158, 268 A.2d 679, 687 (1969); *In Re Dean,* 167 Pa.Super. 92, 100, 74 A.2d 538, 541 (1950). *See generally* 3 Am.Jur.2d *Agency* § 12 (1962). This position is an apparent recognition that capacity may vary with the complexity of the delegable act, *e.g.,* a simple sale of an item of personal property requires less competency than conducting an intricate business transaction. *Cf. Restatement (Second) of Agency* § 122, Comment d (1958).

The powers conveyed by a power of attorney may be limited in scope (special) or, as in the document at issue, may grant broad powers (general) enabling the agent to conduct a variety of legal transactions. Consistent with the *Restatement* position, it might appear that the requisite capacity for granting the power is dependent upon whether the principal had capacity to perform each of the transactions which the attorney-in-fact is authorized to perform. However, it would be cumbersome for courts to determine whether the grantor of the power met different competency tests to perform the various transactions authorized by a general power of attorney.

Our legislature has expressly authorized the use of durable powers of attorney which by their own terms survive the disability of the principal. *See* A.R.S. § 14–5501. The legislature has further provided that an agent who acts without actual knowledge of the incompetence of his principal pursuant to a non-durable power of attorney nevertheless binds the principal. A.R.S. § 14–5502.[1] These enactments reflect preference for a policy facilitating the use of powers of attorney without inquiry regarding the principal's competency to enter each transaction for which it is used. *See also* R.W. Effland, *Caring for the Elderly Under the Uniform Probate Code,* 17 *Arizona L. Rev.* 373, 374, n. 5, 408–411 (1975). We do not imply that a challenge is precluded on grounds of competency to specific uses of the power. However, we reject a test for the capacity to *execute* a general power of attorney that would require inquiry into each potential transaction which it authorizes.

■ Decisions in other jurisdictions generally focus on the grantor's ability to understand the general nature of the document he is executing rather than his competency to perform the acts included in the power of attorney. *See Roybal v. Morris,* 669 P.2d at 1104; *Umsheid v. Simnacher,* 106 A.D.2d 380, 482 N.Y.S.2d 295, 298, (2 Dept.1984); *Tomlinson v. Jones,* 677 S.W.2d 490, 492 (Tex.1984). We have found one decision equating the capacity to grant a power of attorney with the capacity to contract. *See Beaucar v. Bristol Fed. Sav. & Loan Ass'n.,* 6 Conn.Cir. at 158, 268 A.2d at 687. But *see Restatement (2nd) of Agency* § 20, Comment b (1958). *Cf. Cote v. A.J. Bayless Markets, Inc.,* 128 Ariz. 438, 444, 626 P.2d 602, 608 (App.1981). We are persuaded that the better test is whether the person is capable of understanding in a reasonable manner, the nature and effect of his act.

---

1. The power of attorney in question was executed and recorded in 1964 prior to the enactment of A.R.S. §§ 14–5501 and 14–5502. Thus, it is not a statutory durable power of attorney.

■ Thus, we must now determine if there was any evidence that Ray lacked that understanding on September 29, 1964 when he granted a general power of attorney to his sister. As appellant points out there was testimony that from 1962 through 1973 Ray was unable to attend to his business affairs because of alcoholism. There was evidence that in April of 1964 he was hospitalized with organic brain syndrome and was experiencing delirium tremens. There was also evidence that he had paralysis of the left wrist which continued after he left the hospital in May, 1964—an indication of continuing neurological problems. However, in order to invalidate an instrument, mental incompetency must exist at the time of the execution of the instrument. *See Estate of Vermeersch,* 109 Ariz. at 127, 506 P.2d at 258. *See also Estate of Head,* 94 N.M. at 659, 615 P.2d at 274. In Arizona there is a presumption of competency which continues despite a subsequent period of incompetency since such persons may have lucid intervals. *See Estate of Silva,* 105 Ariz. 243, 247, 462 P.2d 792, 796 (1969). Evidence that someone is a chronic alcoholic and at times has had acute alcoholic symptoms rendering him temporarily incompetent does not prove incompetency. *Warner's Estate,* 166 Cal. App.2d 677, 333 P.2d 848, 852–853 (1959).

■ We find no evidence in this record from which reasonable minds could conclude that Ray was incompetent on September 29, 1964 when he executed the power of attorney in question. We therefore affirm the trial court's directed verdict on that issue.

■ We must next determine whether the power of attorney remained valid after Ray's stroke on November 30, 1964. As a general rule of common law, the power of an agent does not survive the incompetency of his principal. *See Restatement (2nd) of Agency* § 122 (1958). However, the *Restatement* contains a caveat to § 122 which provides:

The institute expresses no opinion as to the effect of the principal's temporary incapacity due to a mental disease.

The comments to this caveat further state:

a. It is not within the scope of the restatement of this subject to state in detail the rules by which it is determined whether a person has capacity.

\*.    \*    \*    \*    \*    \*

d. The agent of one who becomes mentally incompetent to act on his own account or to appoint an agent, does not necessarily lose authority to act for the principal. Very brief periods of insanity caused by temporary mental or physical illness of the principal do not destroy the power of a previously appointed agent to act in his behalf. Further, the mental disease causing insanity has no definite boundary at which a person loses capacity. Thus, one may have capacity to make a will without having capacity to conduct an intricate business transaction. Even where there is a pronounced mental incompetency, there may be ratification of previously executed transactions during lucid intervals. The matter is too amorphous for a statement of a definite rule.

Case law on the effect of the principal's incompetency following the execution of a power of attorney is conflicting. Some courts have held that the power is automatically terminated by the principal's incompetence. *Berry's Estate,* 69 Misc.2d 397, 329 N.Y.S.2d 915 (Sur.Ct.1972); *Merritt v. Merritt,* 27 A.D. 208, 50 N.Y.S. 604 (1898); *In Re Dean,* 167 Pa.Super. 92, 74 A.2d 538 (1950). More recent decisions have held that where the incapacity of the principal is temporary, the agent's acts are not void but rather voidable by the principal or his estate. *See e.g., United States v. Manny,* 645 F.2d 163 (2d Cir.1981); *Campbell v. United States,* 657 F.2d 1174 (Ct.Cl.1981); *United States v. Price,* 514 F.Supp. 477 (S.D.Iowa 1981); *Estate of Watson v. Simon,* 442 F.Supp. 1000 (S.D.N.Y.1977); *Silver v. United States,* 498 F.Supp. 610 (N.D. Ill.1980); *Millman v. First Fed. Sav. & Loan Ass'n,* 198 So.2d 338 (Fla.App.1967).

Following the enactment of of A.R.S. § 14–5502 this issue was statutorily decided in Arizona with respect to transactions occurring after January 1, 1974. (The statute validates an agent's acts done in good faith under a written power of attorney without actual knowledge of the death, disability or incompetence of his principal). However, the pertinent events in this litigation occurred prior to the effective date of the statute. We find no Arizona decisions as to the effect of incompetency of the principal following an execution of a power of attorney at the times pertinent to this appeal. We do not decide this issue because we find no evidence in the record of Ray's incompetency at the time of the transactions which are challenged in this litigation.

Mary used her power of attorney to terminate Trust 1722 on August 17, 1966 and to transfer the Buckeye property to the Hunter Holding Corporation on September 26, 1968. We must determine whether there was evidence of Ray's incompetency on these two occasions sufficient for submission of the issue to the jury.

There was testimony that as a result of the stroke suffered on November 30, 1964, Ray could express himself through a very limited vocabulary from the time of his stroke until his death. There was also evidence that he continued drinking alcohol to excess and suffered occasional severe seizures throughout the remainder of his life. Ruth expressed an opinion that she did not consider him competent to carry on his business affairs.

In June of 1968 Ray attempted to commit suicide and was described as being "very despondent." He was hospitalized for a variety of ailments on at least three occasions between November, 1964 and September, 1968.

Ruth relies upon testimony of Dr. Maier Tuchler, a psychiatrist. She contends that Dr. Tuchler testified that in his expert opinion, Ray was incompetent during the time the questioned transactions occurred. However, we find that Dr. Tuchler's testimony falls short of expressing such a con-

clusion. Dr. Tuchler had never met the decedent and based his opinion on a review of Ray's medical records. He testified that Ray's intellect and ability to care for himself and his property would have been impaired by his stroke. He also stated that if Ray had continued to consume alcohol after his stroke, Ray's judgment might have been further impaired and he might have been left incapacitated. He testified that in his opinion Ray needed assistance to take care of his property and that Ray would have had difficulty in understanding the 1966 transaction as counsel described it. However, Dr. Tuchler did not testify that Ray was incapable of understanding the transactions in question. To allow the issue of Ray's competency to go to the jury on the basis of this evidence would have permitted the jury to draw speculative inferences not based on probative facts. A directed verdict was therefore proper. *Schade's Estate*, 87 Ariz. 341, 344, 351 P.2d 173, 175 (1960).

While the evidence of Ray's serious health problems gives rise to a reasonable inference that he may have been susceptible to the influence of others, it does not rise to the level of probative evidence on mental competency. It simply does not address the issue of whether Ray was capable of understanding the actions required to terminate Trust 1722 or to transfer his land to the Hunter Holding Corporation.

We find no evidence which would justify reasonable persons in finding Ray to be incompetent following his stroke and affirm the trial court's direction of a verdict on that issue.

## TRUST 1722

Trust 1722 was a real estate holding trust created in 1962 which provides that Arthur Raymond Hunter, Sr. and Molly Hunter as trustees vested title to their ranch with Arizona Title Insurance & Trust Company as trustee for the benefit of seven of their children including Ray. The trust provided that upon written direction of Ray, Leslie and Joe Hunter, the trustee

could execute deeds or otherwise deal with title to the trust property.

On August 17, 1966, Leslie and Joe (Ray's brothers) and Mary, using her power of attorney on behalf of Ray, directed the trustee to reconvey the trust res to their parents. On the same day six of the Hunter children signed articles of incorporation for the Hunter Holding Corporation. On August 29, 1966 these articles of incorporation were filed and shares were issued to the senior Hunters. Title to the ranch property was then transferred to the Hunter Holding Corporation in exchange for a promissory note for $28,200. On September 1, 1966 the senior Hunters assigned their shares to six of their children excluding Ray. The children signed promissory notes in favor of their parents as "payment" for their shares of stock.

Ruth sought to have the reconveyance of the trust res to the senior Hunters set aside on grounds that the power of attorney was invalid or, alternatively, to impose a constructive trust on the ranch property on behalf of her father's estate.

Appellees' position on appeal with respect to Trust 1722 differs somewhat from their position at trial. They moved for summary judgment on grounds that there had been no complete inter vivos gift to the trust because the property remained in actual control of the senior Hunters. However, for the first time on appeal they add the contention that there was no evidence that the deed to the trust property was conveyed to the trustee. Apparently, they are arguing either that there was no proof of title or no proof of delivery to effectuate a conveyance. *See generally Restatement (Second) of Trusts* § 32(1), comments a and b (1959). This position appears to be in direct conflict with their pretrial statement acknowledging as an undisputed fact that the senior Hunters had transferred the land by deed to Arizona Title & Trust Company. To now question whether the document reciting that transfer was sufficient to establish that transfer raises an issue

not argued in the trial court and therefore we will not consider it on appeal. *See Milam v. Milam,* 101 Ariz. 323, 325, 419 P.2d 502, 504 (1966); *Stratton v. Inspiration Consolidated Copper Co.,* 140 Ariz. 528, 530, 683 P.2d 327, 329 (App.1984).[2] We conclude that there was evidence before the trier of fact that legal title had been conveyed to the trustee by the senior Hunters.

The essential elements of a trust are a competent settlor and a trustee, clear and unequivocal intent to create a trust, ascertainable trust res, and sufficiently identifiable beneficiaries. *Lane Title and Trust Co. v. Brannan,* 103 Ariz. 272, 276–277, 440 P.2d 105, 109–110 (1968); *Jabczenski v. Southern Pac. Memorial Hosp. Inc.,* 119 Ariz. 15, 19, 579 P.2d 53, 57 (App.1978).

Appellees argue that Ray did not have a beneficial interest in Trust 1722 because there was no valid inter vivos gift to the trust. They argue that the creation of a trust required the senior Hunters to relinquish their possession and control over the property. *See Goff v. Guyton,* 86 Ariz. 349, 352, 346 P.2d 286, 288 (1959); *Stewart v. Damron,* 63 Ariz. 158, 163, 160 P.2d 321, 323 (1945). It is appellees' further contention that in order to constitute a completed inter vivos gift of land the donor must give actual physical possession, citing *Shores v. Shores,* 134 Colo. 319, 303 P.2d 689 (1956) and *Johnson v. Hilliard,* 113 Colo. 548, 160 P.2d 386 (1945). However, we note that these cases involved an attempt to establish an inter vivos gift where possession was necessary. They do not deal with the creation of a trust res.

Appellees note that the Hunters remained in possession of the alleged trust property, retained all income from the property and did not pay rent to the trustee or beneficiaries. They also refer to testimony indicating that several beneficiaries believed that their parents continued to own the farm and had authority to deal with it as they wished. They point out that

**2.** Appellant has appended to her reply brief a copy of a warranty deed purporting to establish this transfer. However, this deed was not part of the record below and will not be considered on this appeal.

Ray did not list an interest in the trust as property when he was involved in divorce proceedings in 1962. Finally, they note that the Internal Revenue Service treated the land as part of the senior Hunters' estate for purposes of federal estate tax. While this evidence supports their position that the Hunters' did not intend to create a trust, our inquiry on this appeal from a directed verdict is whether there was evidence to the contrary.

We find no authority for the proposition that the physical control of real property must be relinquished in order to transfer an interest in it in trust to a third party. In this case title to the land was transferred to a trustee by the execution and delivery of a deed to the property. The delivery of a deed of conveyance is sufficient. *See Restatement (Second) of Trusts*, § 78 (1959); 76 Am.Jur.2d, *Trusts*, § 35 (1975). Furthermore, there is substantial authority to the effect that no immediate enjoyment by the donee of a gift need occur in order for there to be a valid, complete gift. *See, e.g., Armer v. Armer*, 105 Ariz. 284, 463 P.2d 818 (1970); *Allred v. Allred*, 57 Ariz. 77, 111 P.2d 68 (1941); *Scoville v. Vail Inv. Co.*, 55 Ariz. 486, 103 P.2d 662 (1940). Where a third party is made trustee, transfer of title to the trustee is evidence of intent and creation of a trust. *See Mahoney v. Leddy*, 126 Vt. 98, 223 A.2d 456 (1966). Whether the transfer of bare legal title when considered in light of the parties' conduct demonstrates a clear intent to create a trust is a factual issue properly determined by the trier of fact. *See Raim v. Stancel*, 339 N.W.2d 621, (Iowa App.1983); *Woodworth v. Cortez*, 660 S.W.2d 561 (Tex.App. 4 Dist.1983).

We find that the trust instrument itself and the transfer of the real property by deed to a trustee provides sufficient evidence from which the jury and court could have concluded that the senior Hunters intended to establish a trust and that Ray Hunter was a beneficiary of that trust.

## CONSTRUCTIVE TRUST

We must next determine whether there was sufficient evidence from which a jury could determine that a constructive trust should be imposed on either the property which was the subject of Trust 1722 or the 160 acres transferred to the Hunter Holding Corporation on September 26, 1968.

A constructive trust arises by operation of law and is generally imposed when property is acquired under inequitable circumstances resulting in unjust enrichment of one at the expense of another. *Stoltz v. Maloney*, 129 Ariz. 264, 267, 630 P.2d 560, 563 (App.1981). The existence of a family relationship without more is not sufficient to warrant imposition of a constructive trust. *Almada v. Ruelas*, 96 Ariz. 155, 159, 393 P.2d 254, 257 (1964); *Stoltz v. Maloney*, 129 Ariz. at 267, 630 P.2d at 563. Factors to be considered in determining whether to impose a constructive trust on behalf of a grantor include the grantor's family relationship with the grantee, age and infirmity, actual dominance on the part of the grantee, and a course of management of the grantor's affairs by a grantee, or other similar facts which would make it inequitable to allow the grantee to prevail. *Estate of Coffin*, 137 Ariz. 480, 482, 671 P.2d 921, 923 (App. 1983).

Ray's health and consequent reliance upon appellees, particularly Mary, after his 1964 stroke are relevant to this inquiry. Ray had relinquished control of his day to day affairs to Mary and other appellees during the nine years preceding his death. After his 1964 stroke Ray was unable to read, had a vocabulary limited to a few words and could not speak in sentences of more than 3 or 4 words. After discharge from the hospital, he lived for a few months with his daughter, with Mary and on his parents' ranch until 1973. He continued to drink and suffered from seizures. He had numerous other medical difficulties including ulcers, pneumonia, gall bladder surgery and heart disease. He attempted suicide in 1968 by shooting himself in the head with a gun. He left his parents' ranch in 1973 because he no longer wished to live there. He lived with Ruth and her husband until his death, which apparently resulted from suicide.

There was evidence that during the time when Ray lived with Mary and his parents he was not told of the termination of Trust 1722. Furthermore, there was evidence that family members falsely denied that the action had occurred. There is also evidence leading to a reasonable inference that Ray believed that he retained his interest in the trust. Under the law, beneficiaries of a trust owe a fiduciary duty to the other beneficiaries. *Christman v. Seymour*, 145 Ariz. 200, 700 P.2d 898, 900 (App.1985). Thus, in our opinion, there was sufficient evidence to place the breach of that fiduciary duty by appellees at issue.

Ray was aware that his Buckeye property had been transferred to the Hunter Holding Corporation. The circumstances of that transaction relate to a 1968 automobile accident which Ray had caused. Following the accident, Mary informed Ruth that she had transferred the land at Ray's request and that Hunter Holding Corporation had agreed to assume liability for Ray's accident and to pay any extraordinary medical expenses that he would incur throughout his lifetime. As defendants point out, there is additional evidence tending to support a conclusion that there was no overreaching with respect to this transaction. However, there is also evidence from which a jury could have found that the transfer was inequitable and a result of undue influence or fraud. For example, Ruth's experts testified to the following: the value of the land was $48,000; the liability for the accident was known to be relatively small *before* the transfer and was ultimately settled for $1,800; Ray had social security benefits sufficient to cover a substantial amount of medical costs; the medical benefits paid out were less than $8,000; an expert witness testified that Ray was susceptible to the influence of persons who were in a position of trust during this period of time. Under these circumstances, we find that there was evidence to go to jury and court with respect to whether a constructive trust should have been imposed on either or both parcels of property in favor of Ruth.

## DISQUALIFICATION OF APPELLEES' ATTORNEY

Prior to trial Ruth Golleher's counsel objected to the participation of Jordan Green of the law firm of Lewis and Roca as counsel for defendants. The basis for this objection was that Mr. Green had been a partner in the law firm of Debus, Busby & Green, Ltd. in 1973 when that firm represented Ruth in petitioning to become her father's guardian. The guardianship involved matters directly connected with this litigation. The record on appeal contains no transcript of the hearing on this objection.

Counsel renewed his objection at commencement of the trial and the objection was overruled. The issue came up again during the trial at which time the court stated "Based upon what I was told about his [Green's] relationship with this case, I made my ruling."

Appellant relies upon *Bicas v. Superior Court*, 116 Ariz. 69, 567 P.2d 1198 (App. 1977) as authority that Green should have been disqualified from participation in the lawsuit. *Bicas* involved a somewhat analogous situation. Attorney David Leonard had been a partner in the law firm of Miller, Pitt & Feldman when that firm represented the plaintiff Bicas. The Miller firm had handled a variety of matters for Bicas and a corporation of which he was the major shareholder. The firm also handled a sales transaction between Bicas and Michael Kahn. Leonard subsequently left the Miller firm and became a partner of the firm of Schorr & Leonard which represented defendant Kahn in a lawsuit brought by Bicas involving the sales transaction. Bicas moved to disqualify Schorr and Leonard as appellees' attorneys. Leonard resisted the motion to disqualify stating that while he was at the Miller firm he did not work on any matters relating to either Bicas or defendants, he had gained no confidential information concerning Bicas or defendants, and he had not been exposed to any information with respect to dealings between the parties.

Paul Wolf, a shareholder in the Miller firm, testified that he had the primary responsibility for representation of Bicas and defendants in their joint matters and on separate personal matters. He also testified that he recalled discussing one legal matter involving Bicas with Leonard. Leonard did not recall the conversation but acknowledged that he might have been asked his opinions regarding a legal issue without knowledge that it involved any particular client. Wolf further testified that Leonard had access to all files.

In finding that Schorr and Leonard should have been disqualified from representing defendants, Division Two of this court discussed cases in which there was a fixed presumption that all lawyers know about every file in an office and obtain confidential information about the matter. The discussion compared certain federal cases which have developed a "peripheral representation" standard. The federal cases discussed in *Bicas* involved large law firms in which former employees or associates of such firms were permitted to offer proof of the absence of disclosure of confidential information. *Compare Kurbitz v. Kurbitz,* 77 Wash.2d 943, 468 P.2d 673 (1970), and *Gas-A-Tron of Arizona v. Union Oil Co. of California,* 534 F.2d 1322 (9th Cir.1976). In finding that Schorr and Leonard should be disqualified from representing defendants, the court stated:

> We agree with plaintiffs that any attorney must avoid not only the fact, but even the appearance of representing conflicting interests. [Citation omitted.] It appears that Leonard while a partner in the Miller firm at the very least had access to information which is material to the present suit. Most important, we believe, as a partner in a relatively small law firm he was involved in the "everyday interchange of ideas and problems" referred to in *Kurbitz* but lacking under the facts of the federal cases relied on by defendants.

116 Ariz. at 73, 567 P.2d at 1202.

*Bicas* was recently discussed by our supreme court in *Alexander v. Superior Court,* 141 Ariz. 157, 685 P.2d 1309 (1984). In *Alexander* the court adopted the reason-

ing of a line of cases requiring strict scrutiny to allow the "appearance of impropriety" to form the basis for disqualification of an attorney. *Alexander* did not involve a factual situation analogous to the instant case. However, its characterization of the *Bicas* case is relevant. The court stated that while *Bicas* might appear to conflict with its holding concerning "appearance of impropriety," *Bicas* could be reconciled. The court stated:

> In *Bicas* ... the court stated that, "any attorney must avoid not only the fact, but even the appearance of representing conflicting interests." [Citation omitted.] Further on in *Bicas,* however, the court held that "[w]here it can reasonably be said that in the course of former representation an attorney *might* have acquired information related to the subject matter at the subsequent representation, the attorney should be disqualified." [Citation omitted.] This statement is limited to the situation where a revelation of a client confidence might be possible.

141 Ariz. at 166, 685 P.2d at 1318.

Although appellant has not argued that the law firm of Lewis and Roca should have been disqualified, appellees concede that if a rule of imputed confidence is applied to this case, both Green and Lewis and Roca are disqualified. However, appellees argue that we should not assume an irrebuttable presumption that a member of a firm has received confidential information concerning all clients of that firm. They refer to Rule 1.10 found in the American Bar Association Model Rules of Professional Conduct and the comments to that rule. In particular they call our attention to the following statement:

> Preserving confidentiality is a question of access to information. Access to information, in turn, is essentially a question of fact in particular circumstances, aided by inferences, deductions or working presumptions that reasonably may be made about the way in which lawyers work together.

They then argue that whether Green had access to information concerning Golleher's prior lawsuit was a factual issue which was properly presented to the trial judge for determination. They argue that since appellant has failed to provide this court with a transcript of that hearing there is no evidence that the trial court abused its discretion in determining on the facts that Green and Lewis and Roca met the burden of proof that Green did not have access to Golleher's files.

*Bicas* as described by our supreme court in *Alexander* appears compatible with appellees' contention that there should be no irrebuttable presumption of disclosure of confidential information. Whether it "can reasonably be said that in the course of former representation an attorney might have acquired information" is generally a factual determination. This implies an inquiry rather than an absolute presumption of disclosure from the fact of prior representation. *See also Developments of the Law, Conflicts of Interest in the Legal Profession,* 94 Harv.L.Rev. 1244, 1328–1334 (1981).

Although not adopted by our supreme court at this time, we feel it important to discuss Rule 1.10 of the American Bar Association Model Rules of Professional Conduct. Rule 1.10 addresses imputed disqualification and provides:

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2.

(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter.

Comments to Rule 1.10 recognize the problems associated with lawyers moving between firms. The comments acknowledge several competing considerations including: (1) the client previously represented must be reasonably assured that the principle of loyalty to the client is not compromised; (2) the rule of disqualification should not be so broadly cast as to preclude other persons from having reasonable choice of legal counsel; and (3) the rule of disqualification should not unreasonably hamper lawyers from forming new associations and taking on new clients after having left a previous association. The comments also acknowledge that if imputed disqualification "were defined with unqualified rigor" there would be a radical curtailment of the opportunity for lawyers to move from one practice setting to another and a curtailment of the opportunity of clients to change counsel.

In discussing reconciliation of these competing principles, the comments also note that the problem cannot be resolved by simple reference to the concept of "appearance of impropriety." Rather, the comments advocate a rule based on a functional analysis of two factors: preserving confidentiality and avoiding positions adverse to the client.

The previously quoted comments treat confidentiality as primarily a factual question of access to information. The comments further advise that in any such inquiry, the burden of proof should rest upon the firm whose disqualification is sought.

While the Model Rules distinguish between the disqualification of an individual attorney and disqualification of his firm, with regard to prior representation of an adverse interest, the defendants have conceded that if Green is disqualified, Lewis and Roca is also disqualified. This is in accordance with DR5–105, Rule 29(a), Arizona Rules of the Supreme Court. *Compare* American Bar Association, Model Rules of Professional Conduct, Rule 1.10.

We have no record from which to review the evidence upon which the trial court concluded that Green could represent plaintiff in this litigation. Absent a showing of an abuse of discretion, we will not reverse

**548**

the decision of the trial court in this matter. However, since we are remanding this litigation on other grounds we direct the trial court's attention to the tests set forth in *Bicas* and *Alexander* should this issue be raised again.

The judgment of the trial court is affirmed in part, reversed in part, and remanded for proceedings in accordance with this opinion.

CORCORAN, P.J., and FROEB, J., concur.